2009 WY 93

Jose LOREDO and Yolanda Loredo, and Alexander Loredo, a minor, by and through his next friend, Yolanda Loredo, Appellants (Plaintiffs),

v.

SOLVAY AMERICA, INC., a Delaware corporation, Appellee (Defendant)., Jose Loredo and Yolanda Loredo, and Alexander Loredo, a minor, by and through his next friend, Yolanda Loredo, Appellants (Plaintiffs),

v.

Gilbert A. Pacheco, Appellee (Defendant)., Jose Loredo and Yoland Loredo, and Alexander Loredo, a minor, by and through his next friend, Yolanda Loredo, Appellants (Plaintiffs),

v.

Joy Technologies, Inc., a Delaware corporation, Appellee (Defendant).

Nos. S–08–0030, S–08–0031, S–08–0032.

Supreme Court of Wyoming.

July 28, 2009.

Representing Appellants: P. Richard Meyer and Pamela T. Harvey, of Meyer & Williams, P.C.; and Heather Noble; Jackson, Wyoming. Argument by Mr. Meyer.

Representing Appellees: Joe M. Tieg, Paula A. Fleck, and Susan L. Lyndrup of Holland & Hart, LLP, Jackson, Wyoming, for Appellees Solvay America, Inc. and Gilbert Pacheco; and Richard A. Mincer, Richard G. Schneebeck, and Lindsay A. Woznick of Hirst Applegate, P.C., Cheyenne, Wyo-

ming, for Appellee Joy Technologies, Inc. Argument by Messrs. Tieg and Mincer.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] In this appeal, we are called upon to consider three interrelated aspects of this case. All three matters arise out of the same set of factual circumstances which, in brief, are that Jose Loredo was seriously injured on August 14, 2002, when tons of rock fell on him in a Sweetwater County trona mine. At the time of the incident, Loredo was operating a roof bolting machine manufactured by Joy Technologies, Inc. Such a machine is used to secure the roof/top of the mine so that miners would not be subjected to potential injury from falling rock as the mine shaft work-areas progressed. During his work effort, the roof of the mine did collapse in the area in which he was operating (an area where the mine roof had not yet been bolted), and Loredo was rendered a quadriplegic by the injuries he suffered.

[¶ 2] In Case No. S–08–0030, Appellants, Jose Loredo, Yolanda Loredo (wife of Jose) and Alexander Loredo (Jose's minor child) (collectively, Loredo), seek review of an order of the district court that granted summary judgment dismissing Loredo's claims against Solvay America, Inc. (Solvay America), the parent company of Jose Loredo's immediate employer, Solvay Chemicals, Inc. (Solvay Chemicals).[1] The essence of Loredo's claim against Solvay America was that it exercised such a significant degree of control over safety at its subsidiary, Solvay Chemicals, as to be responsible for the lack of adequate safety in the trona mine.

[¶ 3] In Case No. S–08–0031, Loredo seeks review of an order of the district court which granted summary judgment to his co-employee/supervisor, Gilbert Pacheco (Pacheco). Loredo contended that Pacheco's supervision (or lack thereof) of safety at the work site just prior to the accident was willful, wanton and reckless (intentional) and ultimately led to Loredo's disabling injuries.

[¶ 4] In Case No. S–08–0032, Loredo seeks review of an order of the district court granting summary judgment in favor of Joy Technologies, Inc. (Joy Technologies), the manufacturer of the piece of equipment that Loredo was using at the time of his injuries. Loredo raised claims of product liability and negligent design against Joy Technologies. These claims focused on the failure of Joy Technologies to equip the roof bolter with a protective canopy so as to eliminate or reduce the possibility of serious injury from falling rock, such as that which occurred in this case.

[¶ 5] We will affirm.

## ISSUES

[¶ 6] In Case No. S–08–0030, Loredo articulates this issue:

> Did the district court err in granting summary judgment dismissing [Loredo's] personal injury and loss of consortium claims against Solvay America, Inc., the parent company of ... Loredo's employer?

Solvay America responds thus:

> Did Solvay America exercise sufficient control over the roof bolting operations of Solvay Chemicals such that it assumed a legal duty of care towards ... Loredo, an employee of Solvay Chemicals?

In his reply brief, Loredo asserts that Solvay America broached these additional issues in its brief:

> 1. Does a genuine issue of material fact exist as to whether Solvay America, Inc. exercised sufficient control over relevant safety issues at the mine operated by its corporate subsidiary, Solvay Chemicals, Inc. so that summary judgment for Solvay America must be denied?
>
> 2. Does W.R.E. 407 bar considering evidence of Solvay America's involvement in subsequent remedial measures such as the purchase of new roof bolting machines

---

1. Solvay Chemicals was, of course, immune from suit under Wyo. Stat. Ann. §§ 27–14–101 and 27–14–404 (LexisNexis 2009).

equipped with canopies to show Solvay America's control over such decisions?

3. Should this Court reach the issue of whether [Loredo's] expert's opinion is admissible when the district court did not rule on this issue, and the issue is not necessary in reviewing the district court's grant of summary judgment?

In Case No. S–08–0031, Loredo raises this issue:

Whether the district [court] erred in granting summary judgment dismissing Loredo's claim against his co-employee supervisor, Gilbert Pacheco.

Pacheco restates the issue like this:

Did the district court correctly hold that [Loredo] failed to raise a genuine issue of material fact as to whether Pacheco intentionally or willfully and wantonly acted to cause Loredo harm or injury?

In his reply brief, Loredo asserts that Pacheco broached these additional issues in his brief:

1. Should this Court disregard much of the evidence in [Pacheco's] Brief as improper under the standard of review applicable when reviewing a grant of summary judgment?

2. How does this Court's recent decision in *Hannifan v. American National Bank of Cheyenne*, 2008 WY 65, 185 P.3d 679 (Wyo.2008) impact this case?

3. Is a co-employee defendant's violation of company policy, or the co-employee's absence from the scene prior to the accident, relevant in determining whether that co-employee acted in reckless disregard of the consequences?

4. Under all the circumstances of this case, including that [Loredo's] co-employee supervisor knew that [Loredo] was not protected from rock fall by any canopy, knew that [Loredo] was operating his roof bolting machine in an area of the mine with unstable roof conditions, and knew that [Loredo] was having difficulties with the steering mechanism of his machine, but the supervisor failed to take any action, does a genuine issue of material fact exist as to whether [Pacheco] acted with

willful and wanton misconduct, as that term is interpreted by Wyoming law?

In Case No. S–08–0032, Loredo raises these issues:

1. When Loredo was severely injured in an underground trona mine by rock falling from the roof while [he] was operating a roof bolting machine designed and sold by Joy Technologies, Inc. that lacked a canopy to protect the operator from falling rocks, did the district court err in granting summary judgment dismissing [Loredo's] product liability and negligent design claims against Joy on the basis that [Loredo] was not injured by Joy's product?

2. On the record in this case, could the district court have granted [Joy Technologies] summary judgment on the ground that the roof bolting machine was not unreasonably dangerous?

3. On the record in this case, was a genuine issue of material fact presented as to whether the risk posed by [Joy Technologies'] roof bolting machine was open and obvious?

4. Was [Joy Technologies] under a nondelegable duty to install safety features such as a canopy to protect miners from falling rock on its roof bolting machine?

Joy Technologies, Inc. responds with this terse capsule of the issues:

Is summary judgment in a products liability case appropriate where the undisputed facts show the product is not unreasonably dangerous?

## FACTS AND PROCEEDINGS

### General Overview

[¶ 7] The instant proceedings were initiated in the district court on October 17, 2005. Loredo was employed by Solvay Chemicals. Solvay America is the parent corporation of Solvay Chemicals, Inc. As articulated by Solvay America's Chief Financial Officer:

Solvay America is a holding company that does not engage in business in its own name. Instead, [it] administers, on behalf of its subsidiaries, certain company-wide functions, including benefits plans, national contracts, travel, use of the Solvay corpo-

rate logos, taxation, treasury, insurance, auditing, and health, safety and environmental reviews for manufacturing plants and other facilities. [*Id.*]

[¶ 8] On the day of his injuries, August 14, 2002, Loredo was operating a "bolting machine," as he had done for many years. The bolting machine was manufactured by Joy Technologies. A roof bolter is a piece of mobile equipment used to install bolts in an underground mine to secure the roof of the mine and prevent collapse after ore is extracted by the mining process. On August 9, 2002, the machine Loredo was using on the day of his injury had undergone repairs. The bolting machine did not have a protective canopy to guard its users from falling rock and debris.

[¶ 9] Loredo was injured when a slab of rock from an unbolted portion of the roof of the mine fell on him. Loredo began his work shift on August 14, 2002, at 6:00 a.m., and the incident at issue here occurred at about 2:45 p.m. Pacheco was Loredo's immediate supervisor that day. As Loredo was moving his roof bolter from one area of the mine to another, he noticed that the left tram of the vehicle was not spinning at the same speed as the right tram, making the machine difficult to steer. Loredo detected it to be a hydraulic problem. By adjusting the speed of one of the trams, to a different speed than the other, he was able to keep it running straight. In addition to the steering difficulties, Loredo's path of progress was impeded by other operations and he drove his machine in reverse for a distance, in order to get to his desired location. Then, as he attempted to turn his machine around and get to that desired location, he got stuck. Loredo got off the machine and spent 10–15 minutes trying to get it unstuck. Next he got back on his machine and resumed his efforts to get unstuck. It was then that a 4 foot by 15 foot piece of slab fell from the mine roof and hit him on the head. That chunk of rock came from a portion of the roof that had not yet been bolted into place. However, Loredo did not realize he was in an unbolted area. Although Pacheco, Loredo's supervisor, knew he was having trouble with his machine, Loredo was told to continue working and that

repairs could be made during "down shift." In addition, Loredo had informed Pacheco on many occasions preceding the accident that the sequence and method of mining being used required him to go into areas where the mine roof was not yet bolted. Because of that situation, Loredo had asked to be transferred to a different job in a different part of the mine. Loredo testified that he knew it was dangerous to put himself into an area that was not yet bolted and that he should not do it if it could be avoided. Furthermore, he indicated that he did not intend to, nor did he want to ever place himself into an unbolted area.

## DISCUSSION

### Claims Against Solvay America

[¶ 10] Our general standard of review is well-known:

> We evaluate the propriety of a summary judgment by employing the same standards and using the same materials as the district court. *Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 11, 126 P.3d 886, 889 (Wyo.2006). Thus, our review is plenary. *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 7, 75 P.3d 640, 647 (Wyo. 2003).
>
> > Wyo. R. Civ. P. 56 governs summary judgments. A summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c). When reviewing a summary judgment, we consider the record in the perspective most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record. We review questions of law *de novo* without giving any deference to the district court's determinations.
>
> *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 11, 123 P.3d 579, 586 (Wyo.2005), quoting *Baker v. Ayres and Baker Pole and Post, Inc.*, 2005 WY 97, ¶ 14, 117 P.3d 1234, 1239 (Wyo.2005).
>
> "A genuine issue of material fact exists when a disputed fact, if it were proven,

would establish or refute an essential element of a cause of action or a defense that the parties have asserted." *Christensen v. Carbon County*, 2004 WY 135, ¶ 8, 100 P.3d 411, 413 (Wyo.2004) (quoting *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, 1055 (Wyo. 2002)). The party requesting a summary judgment bears the initial burden of establishing a prima facie case for summary judgment. If he carries his burden, "the party who is opposing the motion for summary judgment must present specific facts to demonstrate that a genuine issue of material fact exists." *Id.* We have explained the duties of the party opposing a motion for summary judgment as follows:

> "After a movant has adequately supported the motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing there are genuine issues of material fact. The opposing party must affirmatively set forth material, specific facts in opposition to a motion for summary judgment, and cannot rely only upon allegations and pleadings ..., and conclusory statements or mere opinions are insufficient to satisfy the opposing party's burden."

The evidence opposing a prima facie case on a motion for summary judgment "must be competent and admissible, lest the rule permitting summary judgments be entirely eviscerated by plaintiffs proceeding to trial on the basis of mere conjecture or wishful speculation." Speculation, conjecture, the suggestion of a possibility, guesses, or even probability, are insufficient to establish an issue of material fact. *Cook*, ¶ 12, 126 P.3d at 890, quoting *Jones v. Schabron*, 2005 WY 65, ¶¶ 9–11, 113 P.3d 34, 37 (Wyo.2005).

*Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶¶ 8–9, 148 P.3d 8, 12–13 (Wyo.2006).

[¶ 11] We have articulated a standard of review more directly applicable to claims such as the one at issue here, in somewhat more detail than our usual and more general standard of review:

> In support of their claim of an independent duty on the part of ARCO, Appellants emphasize their record presentation of certain evidence which they assert demonstrates genuine issues of material facts. They point to the Wyoming Workers Compensation Division record showing Sharon Fiscus to be an employee of ARCO and that the benefits she received came from ARCO's Wyoming workers' compensation account. They rely upon the fact that ARCO retained a fifty percent (50%) overriding royalty interest in the mine, and they mark the fact that the Bureau of Land Management continues to refer to mining leases relating to the Thunder Basin's Black Thunder Mine as jointly held by ARCO and Thunder Basin. Appellants contend that ARCO pays all taxes on the mine. More precisely, then, they show that ARCO officials paid visits to the mine which would average four times a day and that various ARCO officials did attend safety meetings conducted by Thunder Basin at the mine. They place a great deal of importance upon the fact that the president of Anaconda Minerals, another corporate subsidiary of ARCO, had sent a memorandum to Thunder Basin recommending the use of seat belts by the employees of Thunder Basin. Furthermore, Appellants contend that the record shows that ARCO reviewed the qualifications of, and interviewed all, safety directors before they were hired by Thunder Basin. There also is reliance upon the fact that ARCO had two representatives at the Black Thunder Mine who worked on Thunder Basin's training program and set policy in regard to training at the mine.

> We have adopted as the legal standard for the liability of a parent corporation the requirement that the parent assume some independent legal duty by retaining or exercising control over some aspect of the operation of a subsidiary corporation which was involved in the incident resulting in the plaintiff's injuries. *Wessel v. Mapco, Inc.*, 752 P.2d 1363 (Wyo.1988); *Fiscus*, 742 P.2d 198. Essentially, this is the same test that is invoked in considering an owner's liability to the employee of a contractor. *Cf. Jones v. Chevron U.S.A., Inc.*, 718 P.2d 890 (Wyo.1986); *Noonan v. Texaco,*

*Inc.,* 713 P.2d 160 (Wyo.1986). We have rejected any doctrine of respondeat superior resulting in liability on the part of a parent corporation for acts of its subsidiary. *Fiscus.* Cf. *Noonan.* The parent company is entitled to the same legal separation from its subsidiary, as well as the resulting protection from liability, that any individual shareholder enjoys with respect to a corporation in which stock is held. *United States v. Van Diviner,* 822 F.2d 960 (10th Cir.1987).

In light of the legal standard and the actual contentions of Appellants, we must test this case against our summary judgment standards. The essential purpose of the summary judgment procedure is to eliminate the expense and burden of a formal trial when only questions of law are involved. *Johnson v. Soulis,* 542 P.2d 867 (Wyo.1975); *Vipont Mining Company v. Uranium Research and Development Company,* 376 P.2d 868 (Wyo.1962). We can approve and sustain a summary judgment only when persuaded that there is no genuine issue with respect to any material fact, and that the prevailing party is entitled to judgment as a matter of law.... Because summary judgment forecloses a trial on the merits, we do not lightly consider appeals from summary judgment. *Larsen; Kobielusz v. Wilson,* 701 P.2d 559 (Wyo.1985). Conversely, however, we recognize that the beneficial purpose of summary judgment would be defeated if cases could be forced to trial simply by an assertion that a genuine issue of material fact exists. *Noonan; Johnson; Maxted v. Pacific Car & Foundry Company,* 527 P.2d 832 (Wyo.1974).

The process for identifying genuine issues of material fact also is familiar. The moving party has the burden of demonstrating the absence of any genuine issue of material fact and justifying its entitlement to judgment as a matter of law. *Jones Land & Livestock Company v. Federal Land Bank of Omaha,* 733 P.2d 258 (Wyo.1987). This is a significant burden, particularly when we note that we examine the record from the perspective of the party opposing the motion and grant to that party the benefit of every favorable inference and reasonable doubt. *Wessel; England v. Simmons,* 728 P.2d 1137 (Wyo. 1986); *Jones; Roth v. First Security Bank of Rock Springs,* 684 P.2d 93 (Wyo.1984). Once that showing is presented by the moving party, however, the burden then shifts to the party defending against the motion to present for the record facts in the form of admissible evidence which structure a genuine issue of material fact. *Dubus v. Dresser Industries,* 649 P.2d 198 (Wyo.1982); *Hyatt v. Big Horn School District No. 4,* 636 P.2d 525 (Wyo.1981); *Moore v. Kiljander,* 604 P.2d 204 (Wyo. 1979); Rule 56(e), W.R.C.P.

It does not matter how genuine a factual issue is; if it does not relate to a material fact, it cannot prevent the entry of a summary judgment. *Johnson,* 542 P.2d 867; *Gladstone Hotel, Inc. v. Smith,* 487 P.2d 329 (Wyo.1971). In *Johnson,* 542 P.2d at 871–72, this court defined a material fact as:

> " * * * [O]ne having some legal significance, that is, under the law applicable to a given case, it would control in some way the legal relations of the parties; as one upon which the outcome of litigation depends in whole or in part; as one on which the controversy may be determined; as one which will affect the result or outcome of the case depending upon its resolution; and one which constitutes a part of the plaintiff's cause of action or of the defendant's defense. A fair summary of these definitions is that for purposes of ruling upon a motion for summary judgment a fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." (Footnotes omitted.)

Such a fact must in some way control, define, or modify the legal relations of the parties in some tangible manner and, thus, have the clear effect of establishing or refuting the essential element of a claim or defense asserted by the parties. *Baldwin v. Dube,* 751 P.2d 388 (Wyo.1988).

We also are mindful of our duty to examine the evidence in the same light as it

was presented to the trial court. *Connaghan v. Eighty–Eight Oil*, 750 P.2d 1321 (Wyo.1988). In so doing, we view the evidence in the light most favorable to appellants and, as we have noted, give them the benefit of every reasonable inference and every doubt....

In this context, the facts which Appellants contend the record will support do not directly contravene the record showing made by ARCO that it did not retain the right to control or exercise control over the safety aspects of the Black Thunder Mine, over the mining operations, or over the scraper that Fiscus operated at the time of her injuries. Appellants must rely upon inferences to be drawn from those facts in order to structure a genuine issue of material fact that will avoid the summary judgment.

This court has adjusted its position over the years with respect to the reliance upon inferences to structure a genuine issue of material fact in the context of a summary judgment. In *Blackmore v. Davis Oil Co.*, 671 P.2d 334, 337 (Wyo.1983), the court quoted from *Forbes Company v. MacNeel*, 382 P.2d 56 (Wyo.1963), and said:

"* * * [T]hat an inference which is contrary to direct testimony is insufficient to support a finding that a genuine issue of material fact exists: * * *."

The court went on to say that, even if it were to assume inferences favorable to the appellants in that case, those inferences could not stand against uncontroverted testimony to the contrary. This concept was applied in *Reed v. Getter Trucking, Inc.*, 735 P.2d 1370 (Wyo.1987). It also had been invoked in *Spurlock v. Ely*, 707 P.2d 188 (Wyo.1985). In *Kobielusz*, 701 P.2d at 560–61, the court recognized the *Blackmore* case, but appeared to temper it with the following language:

"* * * Although we have held inferences contrary to direct testimony may not ordinarily support a finding, *Blackmore v. Davis Oil Company*, Wyo., 671 P.2d 334 (1983); *Forbes Company v.*

*MacNeel*, Wyo., 382 P.2d 56 (1963), that determination usually depends upon the quality of evidence creating the inference and the direct testimony."

In *Matter of Estate of Roosa*, 753 P.2d 1028 (Wyo.1988), the court attempted to resolve any apparent conflict between *Blackmore* and *Kobielusz*, noting the following additional language from *Kobielusz*, 701 P.2d at 562–63:

"'A reasonable inference is as truly evidence as the matter on which it is based, and is not a mere presumption or guess; appropriate inferences from proved facts are not a low order of evidence, but are just as valid as evidence as statements of eye-witnesses and are to be weighed by the jury along with the other evidence before it and may be strong enough to outweigh positive and direct oral statements. Whether or not they should be permitted to overcome positive and direct testimony depends, in every case, on the relative strength of the one or the other.' 32A C.J.S. Evidence § 1044."

In *Roosa*, the court considered the concept of sequential inferences in the context of summary judgment and adopted the Wigmore view (1A Wigmore, Evidence § 41 (Tiller's rev.1983)) to the effect that an inference may be drawn from a fact that itself was inferred when the circumstances demonstrate no other reasonable theory or alternative inference with respect to the initial fact. Perhaps this is simply another way of comparing the quality of the inferred fact with the direct testimony. *Kobielusz.*

*Fiscus v. Atlantic Richfield*, 773 P.2d 158, 160–62 (Wyo.1989).

[¶ 12] The district court issued a detailed decision letter which we set out below[2]:

The above-entitled case is currently before the Court on Defendant Solvay America's motion for summary judgment. Solvay America, Inc. asserts that, as a parent corporation to Solvay Chemicals, it owes Plaintiff Jose Loredo no legal duty for the alleged negligence that resulted in his in-

---

**2.** Parenthetical references to the record on appeal are from the district court's original decision letters.

juries. This Court finds that Solvay America did not exercise control over a particular aspect of the Solvay Chemicals operation to such an extent that Solvay Chemicals was not entirely free to do the work its own way and that was involved in the incident which resulted in Plaintiff's injuries. The motion for summary judgment is granted for the following reasons:

## I. BACKGROUND

This case is a personal injury case resulting from a mining accident at the Solvay Chemicals, Inc. trona mine near Green River, Sweetwater County, Wyoming. On August 14, 2002, while operating the mine roof bolter, Jose Loredo, Plaintiff, was rendered quadriplegic when he was struck by a slab of rock falling from the ceiling of the mine. Defendant, Solvay America, is the parent company of Solvay Chemicals. Defendant asserts that it is entitled to judgment as a matter of law, as it did not control an aspect of the Solvay Chemicals operation that resulted in Plaintiff's injury.

## II. DISCUSSION

Defendant Solvay America's motion for summary judgment focuses upon a single, main issue. Defendant asserts that in light of *Fiscus v. Atlantic Richfield,* 773 P.2d 158 (Wyo.1989), it did not exercise control over a particular aspect of Solvay Chemicals that was involved in the incident which resulted in Plaintiff's injuries. The Court agrees, Defendant is entitled to judgment as a matter of law, and summary judgment shall be granted.

The immediate question before the Court is whether Solvay America owed a legal duty to Plaintiff for the alleged negligence that resulted in Plaintiff's injury. A negligence claim is built by four elements: duty, breach, causation, and damages. *Franks v. Indep. Prod. Co., Inc.,* 2004 WY 97, ¶ 9, 96 P.3d 484, 489 (Wyo.2004). The question of "duty" is whether, upon the facts in evidence "the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Hatton v. Energy Elec. Co.,* 2006 WY 151, ¶ 10, 148 P.3d 8, 13 (Wyo.

2006) (citations omitted). Summary judgment would be appropriate if the pleadings, depositions, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P. 56(c) (LexisNexis 2007). Defendant, the moving party, bears the burden to justify "its entitlement to judgment as a matter of law." *Id.* An award of summary judgment is rare in negligence cases, *Franks,* ¶ 9, 96 P.3d at 489; however, the "surest route to summary judgment in negligence actions" is the failure to "establish the existence of a duty on the part of the defendant," *Hatton,* ¶ 10, 148 P.3d at 13 (citations omitted); *Krier v. Safeway Stores 46, Inc.,* 943 P.2d 405, 408 (Wyo. 1997).

Defendant Solvay America asserts it owes no duty to Plaintiff as the parent company of Plaintiff's employer, Solvay Chemicals. The "mere fact" that Solvay America is the parent company to Solvay Chemicals "neither immunizes nor automatically subjects" Solvay America to a negligence suit. *Horowitz v. Schneider Nat'l, Inc.,* 708 F.Supp. 1579, 1580 (D.Wyo. 1989). For a parent corporation to be liable for an injury to its subsidiary's employee, the parent corporation must have assumed "some independent legal duty by retaining or exercising control over some aspect of the operation of a subsidiary corporation which was involved in the incident resulting in the plaintiff's injuries." *Fiscus,* 773 P.2d at 160. Whether the parent corporation has retained the right to control is ordinarily a question "of fact for the trier of fact, but becomes one of law when only one reasonable inference can be drawn." *Noonan v. Texaco, Inc.,* 713 P.2d 160, 164 (Wyo.1986).

In *Fiscus v. Atlantic Richfield,* the court found that the parent corporation owed no duty to its subsidiary's employee who was injured while operating a piece of heavy equipment owned by the parent corporation. 773 P.2d at 158. The employee asserted that the parent corporation owed her an independent duty because the parent corporation had "assumed affirmative duties with respect to safety" at the mine

where the employee worked. *Id.* at 159. The court found no "inference of a retention of a right of control or the exercise of control over the activities" though the parent corporation retained an overriding royalty interest in the mine, paid all taxes on the mine, unified its accounting procedures with the subsidiary, and frequently sent its officials into the mine. *Id.* at 162. The court refused to infer that the mine visits were exclusively for the purpose of supervising operations as "there are many other valid purposes for those visits," *id.,* or to infer control over safety operations by "the mere availability" of parent corporation representatives to assist with the subsidiary's training program, *id.* at 163. The court upheld summary judgment and found that the circumstances relied upon by the employee failed to demonstrate a genuine issue of material fact with respect to the parent corporation's "assumption of some independent legal duty." *Id.*

Because "a parent corporation is analogized to an owner of a work site," *Horowitz,* 708 F.Supp. at 1580, whether the parent corporation shall be shielded from liability, is essentially "the same test that is invoked in considering an owner's liability to the employee of a contractor," *Fiscus,* 773 P.2d at 160. The court has held that an employer "who retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety owes a duty of reasonable care to an employee of the independent contractor even if the employee is injured doing the very work the contractor was hired to perform." *Jones,* 718 P.2d at 896. In order for there to be a demonstration of the employer's "assumption of affirmative duties with respect to safety" there must be "such a retention of a right of supervision that the contractor is not entirely free to do the work his own way." *Stockwell v. Parker Drilling Co., Inc.,* 733 P.2d 1029, 1033 (Wyo.1987) (*quoting* Restatement (Second) of Torts § 414, cmt. c (1965)). Where, for example, the owner of the work site requires safe equipment and workmanship or even disciplines employees for unsafe practices but does not direct the method of the contractor's

work performance, it does not retain sufficient control over the details of safety to render it liable. *Jones,* 718 P.2d at 896; *Noonan,* 713 P.2d at 167. "It is not enough that [the work site owner] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." *Stockwell,* 733 P.2d at 1033 (*quoting* Rest[atement] 2d Torts § 414, cmt. c) (emphasis omitted). Reserving the "right to require safe equipment, material, and supplies to be used by the contractor," the owner of the work site can merely be assured that the work will be performed "efficiently, in a good workmanlike manner, at a reasonable cost, and that the final result is as good as possible." *Noonan,* 713 P.2d at 167. In such a case, the owner of the work site owes no duty of reasonable care to an employee of the independent contractor. *Jones,* 718 P.2d at 896.

The court found that the owner of the work site, Chevron, had retained "enough real control to raise a duty of reasonable care" for the injury of an employee of its independent contractor in *Jones v. Chevron,* 718 P.2d at 897. The employee had been injured while painting a metal platform between two power poles when electricity from nearby transformers arced through the employee and knocked him to the ground. *Id.* at 892. Chevron discouraged the de-energization of the electric line and made permission for de-energization difficult to obtain; consequently, the court found that Chevron retained control over energizing the power lines and that Chevron prohibited the independent contractor from controlling that safety aspect of its work. *Id.* at 896–897. As a result, Chevron had retained "enough real control to raise a duty of reasonable care" for the employee's injury. *Id.* at 896. In *Jones,* Chevron retained control directly over the element of safety that caused the employee's injuries.

Similarly, the Tenth Circuit Court of Appeals upheld the denial of summary

judgment where inferences from the evidence raised a question as to whether a parent corporation retained responsibility for mine safety in a case in which a coal mine employee was injured by a piece of rock falling from the mine ceiling. *Smith v. Atlantic Richfield Co.*, 814 F.2d 1481, 1481 (10th Cir.1987). The evidence suggested that the parent corporation may have retained control over some aspect of mine safety matters. "[The employee] contended that roof control was, to some extent, left to the discretion of the mine foreman, but that there was evidence that various employees of [the parent corporation] were assigned to the Beaver Creek mine from time to time who were given responsibility for safety matters, including roof control problems." *Id.* at 1483. The court found that an inference could be made from the evidence that the parent corporation was "providing safety advice and services;" consequently, whether the subsidiary had delegated responsibility for safety to the parent corporation and whether the parent corporation had negligently performed it, precluded summary judgment. *Id.* at 1488–1489.

The test in finding whether Solvay America assumed an affirmative duty is not whether it operated *any* control in the mine, but whether Solvay America controlled the aspect of the mining operation that was involved in the incident that resulted in Plaintiff's injuries to such a degree that it directed how that aspect should or should not be done. *Fiscus*, 773 P.2d at 160; *Wayts v. Peter Kiewit Sons, Inc.*, 936 F.2d 584 (10th Cir.1991), 1991 WL 114736, *1 (*unpublished disposition* ). Such a question of fact may be created by a reasonable inference drawn from the evidence, the relative strength of which has been weighed against "positive and direct testimony" and found strong enough to overcome direct testimony. *Fiscus*, 773 P.2d at 162 (citations omitted). Plaintiff has placed much emphasis upon Solvay America's safety audits, safety recommendations, and other involvement at the Wyoming mine, however, the evidence does not raise an inference that Solvay America controlled an aspect of the mining operation that was involved in the incident that resulted in Plaintiff's injuries to such a degree that Solvay Chemicals was not free to operate as it saw fit.

Plaintiff argues that Solvay America's safety audits and recommendations allow an inference that Defendant retained control over safety issues in the Solvay Chemicals mine. The evidence demonstrates that Solvay America personnel regularly visited the Wyoming mine, performed safety audits, and made recommendations to correct mine safety deficiencies. (Hughes Dep. at 74, ll. 1–4, ll. 11–12; Vendetti Dep. at 33, ll. 18–19.) About every third year, Solvay America performed safety audits at the mine to ensure compliance with the established safety policies, to secure improved safety performance, and to examine whether the mine responded with corrective measures to any accident causing an injury. (Neville Dep. at 23, ll. 23–25; p. 43, ll. 4–15.) Ronald Hughes, Mine Manager at Solvay Chemicals, testified that Solvay Chemicals was obligated to either implement a safety recommendation or to "supply a good reason why [it] chose not to." (Hughes Dep. at 72, ll. 3–17.) Hughes could not recall a time in which Solvay Chemicals ignored a safety recommendation, but he assumed that there would be negative consequences for ignoring such a recommendation. (Hughes Dep. at 75, ll. 4–7, ll. 14–16; p. 76, ll. 2–3.) Although Solvay America discouraged unionization, David Birney, C.E.O. of Solvay America, testified that Solvay America merely opposed unionization to avoid the inflexibility of a collective bargaining agreement rather than for the purpose of depriving employees of safety negotiations. (Birney Dep. at 74–76.) The evidence demonstrates that Solvay America offered only general safety recommendations which could be rejected or applied by Solvay Chemicals in accordance with Solvay Chemicals' needs.

The evidence indicates that Solvay Chemicals had the last word on safety issues and procedures. When performing a safety audit, Solvay America personnel applied "general safety philosophies" and

recommended general, generic corrections to safety deficiencies. (Adamson Dep. at 135, ll. 15–19.) Michael Neville, a former Health Safety and Environmental Advisor and a current consultant for Solvay America, testified that Solvay America expected its subsidiaries to develop *individual* safety policies in accordance with subsidiary needs under the direction of Solvay America's established procedural policies, generic guidance on how to write policies, and safety audits. (Neville Dep. at 22, ll. 23–25; p. 23, ll. 1–16.) Solvay America's Corporate Safety and Security Manager, Randy Thompson, testified that Solvay Chemicals was free to implement or reject safety recommendations, which it often adopted, but that there was no specific method to achieve compliance with regulatory requirements. (Thompson Dep. at 121, 11.2–20.) Thompson noted, "As long as they get there and it's improved safety and it's legal and ethical, that's acceptable." (Thompson Dep. at 121, ll. 15–20.) Robert Adamson, a former Solvay Chemicals Safety Training Advisor, testified that any safety deficiency was to be corrected; however, Solvay Chemicals viewed Solvay America's safety advice as "welcomed assistance" to be taken under advisement and used when applicable. (Adamson Dep. at 134, ll. 12–16.) In fact, in the event of an injury in the mine, Solvay Chemicals performed its own investigation to "determine [its] next course of action." (Neville Dep., p. 42, 11.8–12.)

Solvay Chemicals was not required to inform Solvay America when equipment needed to be replaced, as "the people that work the mine" were better experienced to make decisions to replace unsafe equipment. (Thompson Dep. at 83, ll. 23–24, p. 84, ll. 1–8.) David Birney testified that Solvay America would occasionally guarantee its subsidiaries' leases of equipment and would, at times, guarantee the debts of its subsidiaries, but he did not suggest that Defendant retained control over the purchase of safe equipment. (Birney Dep. at 84–85.) Kent Adamson testified that if new safety equipment were needed, cost would be considered, but there was no requirement or tradition of discussing the purchase or its cost with Solvay America. (Adamson at 109, 11. 10–24.) Michael Montoya, who coordinates and directs the Solvay Chemicals mine engineering group, testified that he was not required to contact Solvay America with information requiring day-to-day operational issues or with requests to remove unsafe equipment from operation. (Montoya Dep., p. 45, 11. 13–22.) He testified, "If a piece of equipment is unsafe and needs to be replaced, we will take it out of service immediately." (Montoya Dep. at 26, 11. 13–15.) The evidence does not leave an issue of material fact as to whether Solvay America retained control over safety at the Solvay Chemicals mine to such a degree that Solvay Chemicals was not entitled to manage safety according to its own methods.

In light of case law, these facts are not enough to create the inference of control by Solvay America. To impose liability upon Solvay America, it is not enough that Solvay America exercised a general right to inspect the mine or to receive reports, to make suggestions or recommendations which were not necessary to follow, or to prescribe "alterations and deviations" to the work. *Stockwell,* 733 P.2d at 1033 (*quoting* Rest[atement] 2d Torts § 414, cmt. c) (emphasis omitted). Control over Solvay Chemicals' safety issues cannot be inferred from Solvay America's safety training, provision of safe equipment, or even a threat of discipline for safety infractions. *Noonan,* 713 P.2d at 167. Case law precludes the inference of control by Solvay America where it operated in merely an "advisory role." *Wayts,* 1991 WL 114736, * 1.

The strength of direct testimony in this case outweighs any reasonable, contrary inference and leaves no issue of material fact. *Fiscus,* 773 P.2d at 162. Unlike the evidence presented in *Jones v. Chevron,* 718 P.2d 890, or *Smith v. Atlantic Richfield,* 814 F.2d 1481, there remains no issue of fact as to whether the parent corporation, Solvay America, retained exclusive control over the aspect of safety that resulted in Plaintiff's injury. Unlike the *Jones* case where control was retained di-

rectly over the de-energization of power lines, which resulted in the employee's electrocution, 718 P.2d at 896, Solvay America did not preclude Solvay Chemicals' independent control over safety issues in its work, *id.* at 897. Similarly, unlike the *Smith* case where a question of fact remained as to whether the parent corporation retained responsibility for safety issues with the mine ceiling, the instrumentality causing the employee's injury, 814 F.2d at 1483, there is no question of fact as to whether Solvay America's safety advice amounts to the delegation of responsibility for Safety by Solvay Chemicals, *id.* at 1488–89. The evidence and circumstances relied upon by Plaintiff fail to demonstrate a genuine issue of material fact as to whether Solvay America assumed some "independent legal duty." *Fiscus*, 773 P.2d at 163.

[¶ 13]   We conclude that the district court's analysis is sound and that it was correct in concluding that Solvay America, as parent corporation of Solvay Chemicals, was not so involved in the day-to-day operations of Solvay Chemicals, as they related to the event that caused Loredo's injuries, so as to pose a genuine issue of material fact whether Solvay America assumed a independent legal duty vis-à-vis Loredo. See generally, Annotation, *Workers' Compensation Immunity as Extending to One Owning Controlling Interest in Employer Corporation*, 30 A.L.R.4th 948 (1984 and Supp.2008); 6 Larson's Workers' Compensation Law, DIGEST: Ch. 112, § 112.01D (2007).

[¶ 14]   We briefly note that Solvay America contends that the affidavit of Loredo's expert, Lewis Barbe, is not admissible so as to defeat summary judgment in its favor. In response, Loredo asserts that the admissibility of that affidavit was not considered in the district court and should not be considered in this appeal. Under the governing standard of review we consider only those papers that were considered by the district court. Hence, we will not consider Barbe's affidavit in our analysis.

[¶ 15]   Evidence was brought forward in the district court of remedial efforts made by Solvay America and Solvay Chemicals following Loredo's injuries. Solvay America makes passing reference to the application of W.R.E. 407 which provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Our perusal of the record indicates that the district court did not consider such evidence below and we, likewise, will not consider it in this appeal.

### Claims Against Co-employee Pacheco

[¶ 16]   Our usual standard of review for orders granting summary judgment applies here as well, and we will not repeat it in detail. However, the matter of co-employee liability and the meaning conveyed by Wyo. Stat. Ann. § 27–14–104(a) (LexisNexis 2009) ("unless the employees intentionally act to cause physical harm or injury to the injured employee ...") have been before this Court on two recent occasions and we make reference to those cases because they do play a significant role in the resolution of the instant matter. See *Bertagnolli v. Louderback*, 2003 WY 50, ¶¶ 10–18, 67 P.3d 627, 630–33 (Wyo.2003). More recently, in *Hannifan v. American National Bank of Cheyenne*, 2008 WY 65, ¶¶ 33–35, 185 P.3d 679, 691–93 (Wyo.2008), we applied our holding in *Bertagnolli* to a case wherein a properly instructed jury found that a co-employee had acted with the requisite "intent" so as to create co-employee liability.

[¶ 17]   With respect to this summary judgment motion the district court made these findings:

> ...

> The above-entitled case is currently before the Court on Defendant Gilbert Pacheco's motion for summary judgment. Defendant Pacheco asserts that he owes no

liability to Plaintiff, a co-employee, because he had no knowledge, contribution, or negligence in the circumstances that resulted in Plaintiff's injury. This Court finds that no issue of fact arises as to whether Defendant willfully and wantonly disregarded Plaintiff's safety concerns which resulted in Plaintiff's injuries; summary judgment is granted for the following reasons:

## I. Background

This case is a personal injury case resulting from a mining accident at the Solvay Chemicals, Inc. trona mine near Green River, Sweetwater County, Wyoming. An experienced operator of Solvay's roof bolter, Plaintiff Jose Loredo was employed to drive metal bolts into the mine's rock ceiling to protect against collapse or falling rocks in freshly mined, underground rooms. On August 14, 2002, the left tram on Plaintiff's roof bolter had not been working properly, and Plaintiff was forced to adjust power to the left side of the bolter in order to maneuver it correctly. Plaintiff's awkward tramming drove one of the bolter's tires into a corner of the mine wall and caused Plaintiff to get stuck. Working the roof bolter's levers, Plaintiff attempted to free the bolter by moving forward and backward. While he worked to free the bolter, Plaintiff inadvertently drove under unbolted mine ceiling. It was here that a slab of rock fell from the mine ceiling and rendered Plaintiff quadriplegic. Plaintiff brought a cause of action against Defendant Gilbert Pacheco, Plaintiff's supervisor at the time of the accident, for the willful, wanton, and intentional disregard of safety concerns raised by the Plaintiff. Defendant counters that no genuine issue of material fact arises as to whether he willfully and wantonly acted to cause Plaintiff's injury.

## II. Discussion

. . . .

The Wyoming court equated "the concept of willful and wanton misconduct" with the statutory language found in W.S. § 27–14–104(a) [FN1] and found that a co-employee is liable for intentionally acting to cause physical harm or injury. *Bertagnolli*, ¶ 15, 67 P.3d at 632. A co-employee supervisor will be found to have intentionally caused physical harm to an employee and to have engaged in willful and wanton misconduct when the supervisor "had knowledge of [a] dangerous condition and demonstrated a disregard of the risks through intentional acts." *Id.* ¶ 19, 67 P.3d at 634. The "aggravating factor" that distinguishes willful misconduct from ordinary negligence is the co-employee's "state of mind that approaches intent to do harm." *Smith v. Throckmartin*, 893 P.2d 712, 714 (Wyo.1995) (citations omitted). An act is "willful" if it "is done purposely, with knowledge-or misconduct of such a character as to evince a reckless disregard of consequences." *Case v. Goss*, 776 P.2d 188, 191 (Wyo.1989).

FN1. Wyoming Statute § 27–14–104(a) (Lexis-Nexis 2007) states, "The rights and remedies provided in this act for an employee ... in extrahazardous employments are in lieu of all other rights and remedies against any employer ... [or] employees acting within the scope of their employment unless the employees intentionally act to cause physical harm or injury to the injured employee...."

Willful and wanton misconduct consists of intentional actions which recklessly disregard the safety of an employee. *Bertagnolli*, ¶ 15, 67 P.3d at 632. "A situation in which a supervisory co-employee has knowledge of a hazardous condition and fails to correct it, although certainly sufficient to indicate ordinary negligence, is not sufficient to satisfy the much more stringent test of culpable negligence." *Cockburn v. Terra Res., Inc.*, 794 P.2d 1334, 1344 (Wyo.1990). A supervisor is liable where he has intentionally acted or intentionally failed to act "in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would in a high degree of probability, result in harm to another." *Bertagnolli*, ¶ 15, 67 P.3d at 632 (citations omitted). Willful misconduct does not arise merely from "a thoughtless, heedless or inadvertent act, or an error in judgment," it is "more than mere mistake resulting from inexperience, excitement or

confusion ... or simple inattention," but it is "an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Smith*, 893 P.2d at 714 (citations and quotations omitted).

The *Bertagnolli* court reversed summary judgment and found material questions of fact existed as to whether the plaintiff's supervisors knew of the general risks surrounding the circumstances which resulted in plaintiff's injury. The supervisors had instructed the employee, under threat of termination, that he shovel ore rubble on a mine "shuttle belt," but they refused to lock the shuttle belt in spite of the employee's requests and concerns over his safety. *Id.* ¶ 21, 67 P.3d at 634. As the employee worked, a sheave wheel caught and severed the back of his right foot; ultimately, the employee's leg had to be amputated below the knee. *Id.* ¶ 7, 67 P.3d at 630. The supervisors testified that they were unaware that the sheave wheel was unguarded, that company policies required the wheel to be locked, that the employee had requested a union steward, or that the employee had been threatened with termination if he did not work on the shuttle belt. *Id.* ¶ 24, 67 P.3d at 635. The court found that a question of fact remained over whether the supervisors "knew of the broader dangers of the shuttle belt area" beyond the unguarded sheave wheel. *Id.* ¶ 25, 67 P.3d at 635. The jury should have been permitted to determine whether the supervisors "intentionally acted to cause physical harm or injury" and whether their actions constituted willful and wanton misconduct. *Id.*

Similarly, the court reversed summary judgment in a case in which the plaintiff had been injured in a fall on a known, but ignored, hidden grease spot on a metal surfaced boom. *Case v. Goss*, 776 P.2d at 194. The court found an issue of fact over whether some of the plaintiff's supervisory co-employees had recklessly disregarded the consequences of their conduct that "a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm." *Id.* at 196 (citations omitted). The mine safety coordinator "was uniquely aware of the dangerous condition of the boom" and had heard the plaintiff's complaints about it but had refused to act and even destroyed the plaintiff's written maintenance request to have the boom cleaned. *Id.* at 196. A maintenance supervisor for the mine knew about the boom's condition but he refused to act upon the plaintiff's suggestion to improve safety measures. *Id.* at 197. Another maintenance supervisor had ignored the plaintiff's complaints about the condition of the boom and threatened to fire the plaintiff if he did not get on the boom to work or if he sought medical attention for his injuries. *Id.* at 197. Whether these supervisors had engaged in a willful or reckless departure from ordinary care was a question of fact for the jury.

In contrast, the court granted summary judgment to the co-employees in *McKennan v. Newman*, 902 P.2d 1285, 1285 (Wyo. 1995), where an employee was killed by a wood chip-augur that entangled him when he tried to unclog it. The plaintiff had shown only ordinary negligence in producing evidence that co-employees had violated company safety policies and OSHA regulations. *Id.* at 1288. The plaintiff failed to demonstrate that the co-employees "acted with knowledge or that the high probability of harm presented by the chip-augur was obvious." *Id.* Likewise, Plaintiff has not demonstrated a genuine issue of material fact is raised as to whether Defendant willfully, recklessly, and intentionally disregarded Plaintiff's safety.

The evidence does not demonstrate the existence of a genuine issue of fact arises over whether Defendant thoughtlessly ignored Plaintiff's safety, made an extreme departure from ordinary care, and recklessly disregarded the dangerous condition presented by the roof bolter's problematic tramming function. Plaintiff testified that Defendant did not demand that Plaintiff should proceed with his work in an unreasonable or dangerous way.

Q. Now, did Mr. Pacheco give you instructions on how to bolt the room?

A. No.

Q. He didn't need to do that, you knew?

A. Yes.

Q. You know how the bolting pattern is supposed to be?

A. Yes.

Q. One every four feet?

A. Every four feet.

Q. Do it from right to left?

A. From right to left.

Q. Okay. You had been doing it that way for years?

A. Yes.

(Loredo Dep. at 32, ll. 4–22.) Plaintiff had suggested to his supervisor that additional roof bolts could improve safety in the mine crosscuts; however, Defendant adhered to the mine's bolting plan and asserted that additional bolting would take too much work time. (Loredo Dep. at 79.) Plaintiff eventually requested a transfer to a different roof bolting position, which was denied by Defendant. (Loredo Dep. at 86.) The evidence indicates that Plaintiff informed Defendant of his concerns over the roof bolter's problematic tramming, but Defendant never threatened Plaintiff with a disciplinary action for notifying him of the defective roof bolter. Plaintiff testified, "Mr. Pacheco told me that to go ahead and run the machine and they'll get it fixed in down shift." (Loredo Dep. at 74, ll. 23–24.) In fact, just prior to his accident, Plaintiff did not inform Defendant that the roof bolter was unsafe to operate because of the tramming problems. (Loredo Dep. at 34.) At the moment of his injury, Plaintiff did not know where Defendant Pacheco was or what he was doing. (Loredo Dep. at 39, ll. 10–12.) Although Plaintiff expressed concern for his safety, the evidence does not suggest Defendant intentionally or recklessly disregarded Plaintiff's safety.

The evidence presented does not raise an issue of fact over whether Defendant exercised an extreme departure from ordinary care and recklessly disregarded the dangerous condition presented by the roof bolter's problematic tramming function. There is no indication ... of an "aggravating factor" suggesting that Defendant intended to do harm. *Smith*, 893 P.2d at 714.

Defendant's adherence to the roof bolting plan and assurance that the roof bolter would be fixed in the "down shift" do not rise to the level of purposeful and reckless disregard of consequences to Plaintiff's safety. *Case*, 776 P.2d at 191. Defendant owes no liability for Plaintiff's injuries.

■ [¶ 18] We conclude the district court correctly determined that there is no genuine issue of material fact apparent in the record on appeal that Pacheco acted willfully, wantonly, or intentionally so as to contribute to Loredo's injuries. Thus, as a co-employee, he remains immune from Loredo's action against him.

**Claims Against Joy Technologies**

[¶ 19] We apply our usual standard of review to the district court's order granting summary judgment in favor of Joy Technologies.

[¶ 20] The district court made these findings with respect to Joy Technologies:

The above-entitled case is currently before the Court on motion for summary judgment brought by Defendant Joy Technologies. The Court finds that Defendant is entitled to judgment as a matter of law on the issues of negligence, strict liability, and punitive damages. Summary judgment is granted for the following reasons:

**I. Background**

This case is a personal injury case resulting from a mining accident at the Solvay Chemicals, Inc. trona mine near Green River, Sweetwater County, Wyoming. During his career at Solvay Chemicals, Plaintiff Jose Loredo operated a mine roof bolter, a machine more than twenty years old designed to drive metal bolts into the rock ceiling to protect against collapse in previously mined, underground rooms. On August 14, 2002, the left tram on Plaintiff's roof bolter had not been working properly, and Plaintiff was forced to adjust power to the left side of the bolter in order to maneuver it correctly. Plaintiff's awkward

tramming drove one of the bolter's tires into a corner of the mine wall and caused the bolter to get stuck. Working the roof bolter's levers, Plaintiff attempted to free the bolter by moving forward and backward. While he worked to free the bolter, Plaintiff drove under unbolted mine ceiling. It was here that a slab of rock fell from the mine ceiling and rendered Plaintiff quadriplegic. Plaintiff has brought claims of negligence, strict liability, and punitive damages against Defendant Joy Technologies, the manufacturer of the roof bolter.

## II. Discussion

The Court must determine whether Defendant is entitled to judgment as a matter of law against Plaintiff's claims of negligence, strict liability, and punitive damages. Summary judgment shall be granted if the pleadings, depositions, and affidavits on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P. 56(c) (LexisNexis 2007). Summary judgment is granted infrequently, and, being a drastic remedy, it is generally not appropriate in negligence actions. *O'Donnell v. City of Casper*, 696 P.2d 1278, 1280 (Wyo. 1985). The Defendant bears the burden to demonstrate that it is entitled to judgment as a matter of law. *Id.* at 1281. This Court will consider the issues of negligence, strict liability, and punitive damages and will conclude that summary judgment is appropriate.

1. Defendant is Entitled to Summary Judgment on the Negligence Claim.

Defendant asserts it is entitled to summary judgment on the claim of negligence. The essential elements of a negligence claim are duty, a breach of that duty, proximate causation, and an injury. *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1280 (Wyo.1983). "A determination of the standard of conduct or duty is a question to be decided as a matter of law." *O'Donnell*, 696 P.2d at 1285. Usually, summary judgment is not appropriate in negligence actions, *O'Donnell*, 696 P.2d at 1280; however, the "surest route to summary judgment in negligence actions" arises from the inability to "establish the existence of a duty on the part of the defendant," *Hatton v. Energy Elec. Co.*, 2006 WY 151, ¶ 10, 148 P.3d 8, 13 (Wyo. 2006) (citations omitted). The Court will address whether Defendant owed a duty to manufacture the roof bolter in such a way as to protect Plaintiff from rocks falling from the mine ceiling, a duty to retrofit the roof bolter, or a duty to warn of dangers associated with falling rocks. The Court will conclude that Defendant owed no such duties.

### a. Duty to Manufacture the Roof Bolter to Protect from Falling Rocks

Defendant owed no duty to manufacture its roof bolter to protect the operator from rocks falling from the mine ceiling. In a products liability action based upon the theory of negligent design or manufacture of a product, there must be a demonstration of "fault on the part of the manufacturer, designer, or distributor." *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 64 (Wyo.1989). A manufacturer bears a duty of reasonable care to plan, design, and manufacture its product so that the product is "reasonably safe to use." *Caterpillar*, 674 P.2d at 1280. A product that is "not reasonably safe" for the user "is defective in design when the foreseeable risks of harm **posed by the product** could have been reduced or avoided by the adoption of a reasonable alternative design by the seller ... and the omission of the alternative design renders the product not reasonably safe." *Campbell v. Studer, Inc.*, 970 P.2d 389, 392, n. 1 (Wyo. 1998) (*quoting* Restatement (Third) of Torts: Products Liability § 2(b) (1998)) (emphasis added) (other citations omitted). The Campbell court affirmed summary judgment because there had been no showing that the asphalt compactor in question was "not reasonably safe for its intended or foreseeable use" at the time that it was manufactured. *Id.* at 394–395. Similarly, in the current case, there has been no showing that the roof bolter in and of itself, even without a chassis canopy, was

not reasonably safe or posed a foreseeable risk of harm. No duty existed for Defendant Joy Technologies to manufacture its product to protect operators from falling rocks.

Other courts have concluded that a purchaser is often in the best position to understand its need for specific safety features and a failure to purchase the safety feature does not represent an equipment defect. The New York court in *Biss v. Tenneco, Inc.*, 409 N.Y.S.2d 874, 876, 64 A.D.2d 204, 207 (N.Y.App.Div.1978), considered whether a loader that overturned, killing its operator, was defectively designed because a roll-over protection structure was not supplied by the manufacturer as a standard, rather than optional, feature. The evidence demonstrated that a roll-over protection structure was available to the purchaser at the time the loader was purchased, and the court found the "defendants had fulfilled their duty to exercise reasonable skill and care in designing the product as a matter of law when they advised the purchaser that an appropriate safety structure for the loader was available." *Id.* Similarly, in *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324, 325 (Colo. App.1985), no defect was found in the design of a tractor where the purchaser had "decided against purchasing either a roll-over protective structure (ROPS) or a falling object protective structure (FOPS)" for use on his "undeveloped mountain land." Because the tractor had been designed for numerous, different jobs in various locations with "some ninety different options designed to enhance the tractor's safety and utility within the specific context of the purchaser's needs," the court found that the omitted protective structures did not result in design defects. *Id.* at 327. The *Biss* and *Davis* courts considered the safety of equipment which malfunctioned when the equipment rolled over—a problematic condition with the equipment itself. No similar malfunction has been shown in the roof bolter; consequently, even without the chassis canopy, the roof bolter was not defective. Defendant owed no duty to manufacture the roof bolter with the canopy.

Defendant owed no duty to protect Plaintiff from anything but hidden defects in its product and owed no duty to warn Plaintiff of anything but concealed dangers in the use of its product. *Parker v. Heasler Plumbing & Heating Co.*, 388 P.2d 516, 518 (Wyo.1964). "([T]he manufacturer or seller of a machine, dangerous because of the way in which it functions, and patently so, owes to those who use it a duty merely to make it free from latent defects and concealed dangers.)" *Id.* The *Parker* court upheld summary judgment, finding that the incinerator in question was patently dangerous and that the plaintiff had not demonstrated the existence of a latent defect or unknown danger. *Id.* at 519. The court said it could not require a manufacturer to produce a "knife that will not cut or a hammer that will not mash a thumb or a stove that will not burn a finger." *Id.* at 518 (citation omitted). Common knowledge should have warned the plaintiff that injury could result from overloading the incinerator with refuse and admitting oxygen through the open incinerator door; consequently, the manufacturer owed no duty to protect against the patently dangerous way in which the incinerator functioned. *Id.* Similarly, there is nothing latently dangerous about the use of the roof bolter, but driving the roof bolter under unbolted mine ceiling was a patently dangerous maneuver—just like any venture under unbolted mine ceiling.

Common knowledge and years of experience should have warned Plaintiff that traveling under unbolted mine ceiling exposed him to sudden rock falls. On the day of his injury Plaintiff struggled to maneuver the roof bolter and trammed the bolter past the last row of ceiling bolts and under a portion of unbolted ceiling. This maneuver exposed him to the known danger of falling rock. Joe Vendetti, the Mine Operations Superintendent at Solvay Chemicals, testified that falling rocks from an unbolted ceiling is almost inevitable.

Q. So is a fresher cut not as likely to fall, I guess, as one that's been sitting there for a while?

A. I can't answer that one way or another either. Some of the cuts, of course, they fall right when you cut them, and they fall on the mining machine itself. But once it's cut and you've went past it and it hasn't fallen yet, we all look at it in this way: It is going to fall eventually. The soon[er] you can support it, the better. It's that minimizing exposure again.

Q. The longer you wait the greater the risk?

A. I believe so.

(Vendetti Dep. at 84, ll. 12–21.) Falling rock in an underground mine is a foreseeable risk; however, it is a circumstance outside of the control of the roof bolter manufacturer. Although the mine bolter was not designed to be trammed backwards, this limitation did not represent a latent defect that caused the rock ceiling to fall. It was the outside condition of falling rock that caused Plaintiff's injuries. Nothing in the manufacture or design of the roof bolter caused the ceiling to collapse. Nothing about the roof bolter was defective by the mere omission of a canopy. As a matter of law, Defendant owed no duty to manufacture its roof bolter with a chassis canopy. Defendant is entitled to summary judgment.

### b. Duty to Retrofit

Defendant asserts that it owed no specific duty to retrofit its roof bolter with the safety feature of a chassis canopy. The majority rule is that "there is no duty to retrofit a product not defective when sold." *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 534 (Ky.2003). There is no need to create an additional duty to retrofit where "traditional principles of negligence and strict products liability suffice." *Id.* at 534 (citation omitted).

In the current case, Plaintiff argues that repeated injuries resulting from the collapse of the mine roof dictate the need to retrofit a chassis canopy to the controller portion of the roof bolter. Plaintiff's evidence is of injuries occurring on the separate, boom portion of the roof bolter. Unlike the controller part of the roof bolter,

the roof bolter boom had been designed to extend underneath unbolted mine ceiling. The evidence does not support the argument that previous injuries raised a duty for Defendant to retrofit the roof bolter to include a canopy for the controller. Defendant owed no duty to retrofit.

### c. Duty to Warn

Wyoming law indicates that even in cases where a product has been flawlessly manufactured, if there is, nevertheless, the likelihood that the product could cause harm unless properly used, a duty to warn arises. *Rohde v. Smiths Medical*, 2007 WY 134, ¶31, 165 P.3d 433, 441 (Wyo. 2007). The jury must consider whether the product "is in a defective condition unreasonably dangerous by virtue of the absence of adequate warning or instruction." *Id.* (quotations omitted). The defect in the product must be shown to be the manufacturer's failure "to warn about the dangers associated with the product." *Id.*, ¶32, 165 P.3d at 441. Defendant owed no duty to manufacture the roof bolter with a chassis canopy and owed no duty to warn Plaintiff of his exposure to the outside danger of rock falls. Summary judgment is appropriate.

2. Defendant is Entitled to Summary Judgment on the Claim of Strict Liability

■ Defendant asserts it is entitled to summary judgment on the claim of strict liability. In a products liability action based upon the theory of strict liability, the focus is upon the product, itself, rather than upon the activities of the manufacturer. *McLaughlin*, 778 P.2d at 64. A plaintiff may recover under a strict liability theory for his loss or injury "resulting from a defective product that entered the stream of commerce in the absence of fault by the manufacturer, designer, or distributor." *Id.* A product manufacturer who sells a product in a defective condition that is unreasonably dangerous may be liable for physical harm to a user if "the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without sub-

stantial change in the condition in which it is sold." *Rohde*, ¶ 17, 165 P.3d at 437 (*quoting* Restatement (Second) of Torts § 402A(*l*) (1965)) (other citation omitted). Accordingly, Wyoming had adopted five elements of strict liability for the sale of a defective product:

(1) that the sellers were engaged in the business of selling the product that caused the harm;

(2) that the product was defective when sold;

(3) that the product was unreasonably dangerous to the user or consumer;

(4) that the product was intended to and did reach the consumer without substantial change in the condition in which it was sold; and

(5) that the product caused physical harm to the plaintiff/consumer.

*Rohde*, ¶ 18, 165 P.3d at 437 (citation omitted). An inference of defectiveness arises "if a prima facie case can be presented that there was no abnormal use of the product or that there were no reasonable secondary causes for the defect." *Id.* ¶ 19, 165 P.3d at 437.

In the current case, there has been no showing of strict liability. There has been no showing that the roof bolter was "not reasonably safe." Plaintiff's injuries were not caused by a defect in the roof bolter but were caused by rock falling from the unbolted mine ceiling. Summary judgment is granted on the strict liability claim.

3. Defendant is Entitled to Summary Judgment on the Punitive Damages Claim

Punitive damages are not favored. They are awarded only "to punish the defendant and deter others from such conduct in the future," rather than to compensate the plaintiff, and will be awarded only for conduct involving "some element of outrage" such as malice or "willful and wanton misconduct." *Alexander v. Meduna*, 2002 WY 83, ¶¶ 40–41, 47 P.3d 206, 218 (Wyo.2002). Plaintiff has made no showing that punitive damages are reasonably related to the harm that has occurred from Defendant's conduct, that there is a degree of reprehensibility in the Defendant's conduct such

as concealment of a hazard, or that the wrongful conduct was profitable to the Defendants. *Id.* ¶ 42, 47 P.3d at 219. Summary Judgment is granted on the punitive damages claim.

In a products liability case, the plaintiff must show that the manufacturer provided a defective product. A defective product is one which is "not reasonably safe" or is "unreasonably dangerous" to the user or consumer. *Campbell v. Studer, Inc.*, 970 P.2d 389, 392 (Wyo.1998); *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 64 (Wyo.1989). The corollary of that statement is if a product is safe for normal use, it is not defective. Campbell, 970 P.2d at 392. In many products liability cases, the plaintiff will attempt to show a defect in the product from the fact that it malfunctioned. In this case, Loredo made no showing that the product itself, the roof bolter, malfunctioned. Instead, Loredo maintained that the roof bolter was defective, i.e., unreasonably dangerous, because a safety device, the chassis canopy, was not standard equipment or a recommended option.

[¶ 21] The district court decided, in part, that Joy owed Loredo no duty because he was not injured by the roof bolter but by the falling rock. That rationale begs the question of whether Joy had a duty to design the roof bolter with a chassis canopy to protect the user from a known danger associated with using the product (falling rock) or to, at least, recommend that such a safety option be incorporated. Following the district court's analysis to its logical conclusion, there would not be any cases where products were found to be defective unless the product itself was the instrumentality of the injury. This position is not borne out in case law. In *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324 (Colo.App.1985), a case that was cited by the district court in its decision letter, the plaintiff was injured when a tree fell on him while he was operating a tractor. He claimed that the tractor was defective because the manufacturer did not attach a rollover protective device or a falling object protective device. Although the plaintiff in that case was not successful in establishing a defect, the decision did not state that he could not maintain his claim because he was in-

jured by the falling tree rather than the tractor itself. Other cases in which the plaintiffs were injured by outside hazards and claimed that the products were defective because they were not equipped with certain safety devices include *Beron v. Kramer–Trenton Co.*, 402 F.Supp. 1268 (E.D.Pa.1975) (alleging defective forklift design for failing to protect against falling objects) and *Braxton v. Georgia–Pacific Corp.*, 419 So.2d 125 (La.Ct.App.1982) (alleging defective crane design for failing to protect against contact with electrical lines).

[¶ 22] Nevertheless, we agree with the remainder of the district court's legal analysis and conclude that Joy Technologies did not owe a duty to Loredo to equip the roof bolter with a chassis canopy. The question of whether a product is defective because a safety device was not standard equipment or a recommended option was discussed at length in Kristine Cordier Karnezis, Annotation, *Products Liability: Manufacturer's or Seller's Obligation to Supply or Recommend Available Safety Accessories in Connection with Industrial Machinery or Equipment*, 99 A.L.R.3d 693 (1980 and 2009 Supp.). Courts typically conduct a balancing test using various factors to determine whether the product's manufacturer or seller has a duty to recommend or supply available safety accessories. *Id.* at § 2[a]. It is important to keep in mind that these factors all lead to an ultimate determination of whether the product is unreasonably dangerous for its intended use.

[¶ 23] One factor that courts consider is the dangerousness of the product without the safety accessory. Kristine Cordier Karnezis, Annotation, *supra*, 99 A.L.R.3d 693, § 2[a]. Consideration of this factor often includes weighing of matters such as: the obviousness/unreasonableness of the danger, relevant safety standards, the presence of a warning, and the effectiveness of the safety device to prevent the risks of injury. *Id.* Another important factor is the relative positions of the manufacturer and buyer. This factor includes such matters as industry custom, the buyer's awareness of the availability of safety accessories or of the danger of using the product without them,

whether the manufacturer offered the safeguards and the buyer refused them, the feasibility of installing the safeguards, and/or the buyer's reliance on the manufacturer's expertise. *Id.*

[¶ 24] Applying these considerations to the case at bar, the undisputed facts establish that Joy Technologies did not owe Loredo a duty to equip the roof bolter with a canopy. The danger of falling rocks in the unsupported area was open and obvious. Solvay's company policies and MSHA regulations prohibited use of the roof bolter in an unsupported area. In fact, Solvay was cited by MSHA after Loredo's accident because he violated mine regulations by operating the roof bolter in an unsupported area. Mine safety regulations did not require canopies under the circumstances of this case, and it was not industry practice to have canopies on the roof bolters. Evidence was presented showing that the roof bolters used in other trona mines in Sweetwater County were not equipped with chassis canopies.

[¶ 25] The purchaser (Tennaco) was informed and knowledgeable about machinery. Prior to purchasing the roof bolter, Tennaco issued a detailed request for bids from various manufacturers, including Joy Technologies. Tennaco's request for bids asked the manufacturers to provide technical information about the products so that Tennaco's engineering staff could make an informed decision about which product to purchase. Although the request for bids did not seek specific safety recommendations, it did ask for a list of available options. Joy Technologies' proposal included the chassis canopy as an option. Tennaco made a conscious decision not to purchase the canopy because the roof bolter was not intended to be used in unsupported roof areas and did not elect to add the canopy when it took over the mine because it had a similar policy prohibiting use of the bolter in unsupported areas.

[¶ 26] When presented with products liability cases where a safety option was offered to a buyer but was refused, courts have routinely "held that the manufacturer or seller had no duty of the kind." Kristine Cordier Karnezis, Annotation, *supra*, 99 A.L.R.3d 693, § 2[a]. See also, *Biss v. Tenneco, Inc.*,

409 N.Y.S.2d 874, 876, 64 A.D.2d 204, 207 (N.Y.App.Div.1978); *Davis v. Caterpillar Tractor Co.*, 719 P.2d 324, 325 (Colo.App. 1985) (holding manufacturers were not liable when purchasers elected not to purchase optional safety devices). This is especially true when, as here, the buyer was sophisticated and knowledgeable about the product and the uses of the product.

[¶ 27] In arguing that Joy had a duty to supply or recommend the chassis canopy, Loredo focuses upon data pertaining to mining accidents. Much of that evidence is not relevant to the circumstances presented here. Instead, it pertains to accidents in coal mines (where canopies are apparently required by MHSA regulations) and accidents occurring when the operator is working from the boom of the roof bolter. Although the evidence could be interpreted as suggesting that canopies used in those situations may prevent injuries, it does not support a conclusion that Joy was required to supply a canopy to protect Loredo from falling rocks in a non-coal (trona) mine while working from the chassis rather than the boom.

[¶ 28] The undisputed facts establish that Joy provided the roof bolter with the requested features to Tennaco, a knowledgeable buyer; the roof bolter, as ordered by Tennaco, did not have any defects and met with mine safety regulations; and Loredo was injured while using the bolter in a manner that was not anticipated or appropriate under applicable policies and regulations. Under these circumstances, Loredo has failed to establish that Joy owed a duty to provide a product that protected him from falling rock. The district court properly granted summary judgment in favor of Joy on all of Loredo's claims.

## CONCLUSION

[¶ 29] We conclude that the district court summary judgment orders were correct in all respects and they are affirmed.