**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 3, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
————————————————————

KATHERINE K. MORGAN, as wrongful
death representative of the deceased
person, David P. Morgan,

     Plaintiff - Appellant,

v.

BAKER HUGHES INCORPORATED, a
Delaware corporation,

     Defendant - Appellee.

No. 17-8002
(D.C. No. 1:14-CV-00210-SWS)
(D. Wyo.)

————————————————————

**ORDER AND JUDGMENT**[*]
————————————————————

Before **LUCERO**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.
————————————————————

     Katherine Morgan, as wrongful death representative of her deceased husband

David Morgan, appeals the district court's grant of judgment as matter of law

("JMOL") in favor of Baker Hughes Incorporated, issued after trial but before the

case was submitted to the jury. Because material disputes in the evidence remain for

resolution by the jury, we conclude that JMOL was inappropriate. Exercising

jurisdiction under 28 U.S.C. § 1291, we reverse the grant of JMOL, while affirming

evidentiary rulings made during the course of trial.

_____

    [*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I

On August 16, 2012, David Morgan ("Morgan") was fatally crushed by a heavy chemical tote that fell from a forklift at his place of employment. At that time, he worked as a Project Coordinator in the Casper, Wyoming warehouse of Baker Petrolite Incorporated ("Baker Petrolite"). Baker Petrolite is a subsidiary of Baker Hughes Incorporated ("Baker Hughes"), a "matrix organization" that owns more than one hundred legal entities in eighty countries. Prior to the accident, Morgan had worked with forklifts at the Casper warehouse for eighteen years, and had received regular training on forklift operation for nine years. Morgan's widow brought suit against Baker Hughes, claiming the company negligently controlled safety operations at the Casper warehouse, which caused Morgan's accident.

In 2010, Baker Hughes acquired BJ Services Company, then-owner of the Casper warehouse. Baker Hughes initially left the safety management systems of BJ Services in effect, having determined that the safety procedures were in accord with applicable Occupational Safety and Health Administration ("OSHA") regulations. In early 2011, however, Baker Hughes began to integrate the forklift safety systems of BJ Services, Baker Petrolite, and another company—Baker Hughes Oilfield Operation—into a single common system.

Prior to entry of JMOL, Richard Bui, Vice President of Health and Safety for Baker Hughes, testified at trial that a "consistent" application of procedures within Baker Hughes was important because of the numerous people moving between organizations. Bui testified that Baker Petrolite controlled the forklift safety program

2

at the Casper warehouse, and that he was not directed by any Baker Hughes employees on how to carry out his Baker Petrolite-related responsibilities. He asserted that it was Morgan who was responsible for implementing safety measures at the Casper warehouse, and that Morgan's immediate contact for safety-related issues was a Baker Petrolite employee.

Other witnesses testified that Baker Hughes promulgated a comprehensive procedural manual on forklift safety that became effective approximately seven months before Morgan's death. Although it was available to employees of Baker Hughes subsidiaries electronically, the manual was not specifically given to Morgan. The manual's contents established requirements for operation of forklifts by "Baker Hughes employees and contract employees at Baker Hughes facilities and at client sites." Managers at Baker Hughes subsidiaries were obligated to ensure requirements in the manual were implemented and verify that "employees and contract employees" were trained to established standards in the manual. One of the documents included in the manual was titled "Forklift Safe Work Practices User Guide." All Baker Hughes entities were required to address the User Guide in their training programs. Bui testified that the manual was designed to provide high-level, generalized procedures that each facility would be free to modify. Each individual facility was ultimately responsible for applying the guidelines in the manual.

The section of the manual most directly implicated in Morgan's death was titled "Parking." It instructed forklift operators to "fully lower" the load when parking a forklift. Additionally, the section specified that when the operator is more

3

than fifteen feet away from the forklift, the forklift "should be turned off and the key removed."

Several years before the accident, one of Morgan's co-workers noticed that when forklifts were running, totes "crept" down the forks as a result of vibration. To steady the tote, Morgan and his coworker developed a practice of roping totes to the forklift to prevent them from moving. Bui, accompanied by a subordinate, visited the Casper warehouse in June of 2012 and discussed forklift safety with Morgan. Noticing a rope tied to a forklift, Bui suggested that the tote might be better secured with a nylon cargo strap. At the time of this visit, Bui worked under the president of Baker Petrolite and also reported to the "head guy of HSE [Health, Safety, and Environment] at Baker Hughes Incorporated."

On the day of the accident, Morgan was working alone in the Casper warehouse. Having suspended a 4,500-pound chemical tote about eighteen inches off the ground on a forklift, he proceeded to take a sample from a valve underneath the tote. The tote tipped forward on top of Morgan and crushed him to death. After one of Morgan's coworkers discovered his body, an individual named David Munzenmaier called OSHA's after-hours phone line to report the fatality. Munzenmaier identified himself as "with Baker Hughes" and his title as "HSES [Health, Safety, Environment, and Security] Director of industrial service portfolio." A fatality narrative prepared by OSHA described "Baker Hughes and Baker Petrolite Corporation personnel" as present during the OSHA examination of the accident site. OSHA additionally described the accident scene as having been preserved by "Baker

4

Hughes and Baker Petrolite Corporation officials." After Morgan's death, Baker Hughes issued a safety alert to all of its subsidiaries. The alert briefly described the circumstances surrounding the accident. It also included immediate recommendations for improving forklift operations, one of which was review of the manual and local documents governing its implementation.

After the plaintiff rested her case, the district court considered and granted a motion by Baker Hughes motion for JMOL under Fed. R. Civ. P. 50.

**II**

We review a district court's grant of JMOL de novo. Strickland v. United Parcel Serv., Inc., 555 F.3d 1224, 1228 (10th Cir. 2009). In this diversity action, Wyoming law controls substantive issues, Mid-Continent Cas. Co. v. True Oil Co., 767 F.3d 1000, 1003 (10th Cir. 2014), but federal law controls the procedural issue of whether plaintiff presented sufficient evidence to withstand a motion for JMOL. Sharon Steel Corp. v. Lakeshore, Inc., 753 F.2d 851, 853 (10th Cir. 1985). We must "draw all reasonable inferences in support of the nonmoving party." Haynes Trane Serv. Agency Inc. v. Am. Standard, Inc., 573 F.3d 947, 955 (10th Cir. 2009). JMOL is "only appropriate if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." Strickland, 555 F.3d at 1228 (quotation omitted). When engaging in this review, we "refrain from weighing the evidence, passing on the credibility of witnesses, or substituting our judgment for that of the jury." Bannister v. State Farm Mut. Auto. Ins. Co., 692 F.3d 1117, 1126 (10th Cir. 2012).

5

Wyoming has explicitly rejected "any doctrine of respondeat superior resulting in liability on the part of a parent corporation for acts of its subsidiary." Loredo v. Solvay Am. Inc., 212 P.3d 614, 620 (Wyo. 2009). Instead, "a parent company can only be held liable for the acts of its subsidiary where it assumed some independent legal duty by retaining or exercising control over some aspect of the operation of a subsidiary corporation which was involved in the incident resulting in the plaintiff's injuries." Medina v. Four Winds Int'l Corp., 111 F. Supp. 2d 1164, 1166-67 (D. Wyo. 2000) (quotation and brackets omitted). Merely advising a subsidiary on safety matters—for example, by drafting company safety policies or investigating accidents at the subsidiary—does not necessarily amount to the assumption of an independent legal duty. See Fiscus v. Atl. Richfield, 773 P.2d 158, 162-63 (Wyo. 1989); Cline v. State of Wyo., Dep't of Family Servs., 927 P.2d 261, 264 (Wyo. 1996).[1]

In order for a parent to escape liability under this standard, the subsidiary must be "entirely free to do the work its own way." Loredo, 212 P.3d at 622. To be held liable, a parent must have "retain[ed] or exercis[ed] control over some aspect of the operation of a subsidiary corporation which was involved in the incident resulting in the plaintiff's injuries." Fiscus, 773 P.2d 158 at 160. We must consider whether the evidence presented at trial, viewed in the light most favorable to plaintiff, is reasonably susceptible to the inference that Baker Hughes controlled operations at

---

[1] Because the Wyoming Supreme Court has held that the "requirement that the parent assume some independent legal duty by retaining or exercising control over some aspect of the operation of a subsidiary" is "[e]ssentially . . . the same test that is invoked in considering an owner's liability to the employee of a contractor," Fiscus, 773 P.2d at 160 (citations omitted), we consider independent contractor cases.

6

the Casper warehouse "to such a degree that it directed how" forklift safety "should or should not be done." Loredo, 212 P.3d at 624.

We conclude that plaintiff presented sufficient evidence to satisfy this standard, and presented an evidentiary conflict that would have best been resolved by the jury. For example, Bui testified that at the time of the accident, he was paid by Baker Petrolite and also reported directly to its president. But he also testified that he reported to the head of Health, Safety, Environment, and Security at Baker Hughes. Bui explained that these dual reporting chains required him to submit "strategic directions" received from Baker Hughes to Baker Petrolite's president and discuss "strategies that were appropriate for Baker Petrolite." Although these reporting chains standing alone might not suffice to impose liability on a parent corporation, see Wessel v. Mapco, Inc., 752 P.2d 1363, 1367-68 (Wyo. 1988), when viewed in context with other evidence presented, the dual reporting structure reasonably supports the inference that Baker Hughes controlled the day-to-day safety operations in the Casper warehouse. Various employees testified that they did not know precisely which Baker Hughes subsidiary employed their co-workers at any given time. Further, employees who were paid by Baker Petrolite described themselves as "with Baker Hughes" and used Baker Hughes email addresses.[2]

---

[2] The dissent states that a lack of clarity cannot make the "exercised or retained control" issue a jury question. But we do not hold that this lack of clarity—demonstrated by the structure of Baker Hughes, the extent to which employees maneuvered between Baker Hughes and Baker Petrolite, and the forklift manual—constitutes dispositive evidence. We merely recognize that this evidence cuts against other evidence on the issue of whether Baker Hughes exercised or retained control over forklift operation at the

7

Evidence presented at trial also suggested that Baker Hughes exercised control over the aspect of the subsidiary's action that is in dispute—the safe operation of forklifts—and did not merely offer generalized policies. See Loredo, 212 P.3d at 622-25. A manual governing the safe operation of forklifts provided such detail that a reasonable jury could consider Baker Hughes' control over Baker Petrolite to be far more significant than the "general, generic" and optional guidelines at issue in Loredo. Id. at 625.[3] The manual established a number of mandatory requirements, such as how many feet the operator must be from the machine before he can switch it off and how many inches a load may be raised during transport. It is difficult to imagine that a facility could develop its own individual safety policy within the mandatory constraints set forth in the Baker Hughes manual. Plaintiff presented evidence that these policies were created by Baker Hughes, were not imposed by

Casper warehouse. Even if "[t]here was ample room for a finding" that Baker Hughes did not control Baker Petrolite, "we cannot substitute our judgment for that of the jury [ ] because we, as jurors, would have arrived at a different conclusion." Cities Serv. Oil Co. v. Harvey, 148 F.2d 780, 783 (10th Cir. 1945).

[3] The dissent notes that there is evidence indicating that Baker Hughes may not have had control over the operation of forklifts in the Casper warehouse, such as the testimony of a coworker of Morgan's and the fact that Baker Petrolite was not in compliance with the manual at the time of Morgan's death. According to the dissent, this evidence establishes that the forklift manual is not a proper basis on which a reasonable jury could decide that Baker Hughes exercised sufficient control. We agree that the forklift manual on its own might not be sufficient to prove that Baker Hughes "controlled the aspect of the [forklift] operation that was involved in" Morgan's death "to such a degree that it directed how that aspect should or should not be done." Loredo, 212 P.3d at 624. However, a conflict in the evidence, like the one between the manual and other evidence presented, is an issue for the jury to address. See Strickland, 555 F.3d at 1228 (JMOL is "only appropriate if the evidence points but one way" (quotation omitted)).

8

regulation,[4] and that the manual applied to the Casper warehouse at the time of Morgan's death.

The organizational structure of Baker Hughes, the lack of clarity regarding who worked for Baker Hughes as opposed to Baker Petrolite, and the level of detail in Baker Hughes documents regulating forklift safety all reasonably support the inference that Baker Hughes controlled forklift safety to an extent sufficient to sustain liability under Wyoming law. Because there is "conflicting evidence or insufficient evidence to warrant a one-way conclusion," JMOL should have been denied. Martin v. Unit Rig & Equip. Co., Inc., 715 F.2d 1434, 1438 (10th Cir. 1983).

## III

The district court also made three evidentiary rulings during trial that plaintiff challenges: (1) excluding evidence of similar incidents at Baker Hughes facilities, (2) excluding evidence of negotiations with OSHA, and (3) declining to take judicial notice of Baker Hughes' Fed. R. Civ. P. 26 disclosures. We affirm all three rulings.[5]

---

[4] As the appellant notes, the forklift parking requirements promulgated in the manual were more conservative than applicable OSHA regulations, which only required that an operator turn the forklift off and remove the key when the operator is more than 25 feet away from the vehicle, and which made allowances for leaving the loaded forks in an elevated position when the forklift is parked under certain circumstances. 29 C.F.R. § 1910.178(m)(i-iii); Letter from John B. Miles, Jr., Dir. of Compliance Programs, OSHA, U.S. Dep't of Labor, to Mitchell S. Allen, re: Standard No. 1910.178 (Apr. 28, 1995).

[5] We conclude it is proper for us to decide these issues "for the guidance of the district court on remand." Colo. Visionary Acad. v. Medtronic, Inc., 397 F.3d 867, 876 (10th Cir. 2005).

**A**

During discovery, Baker Hughes produced a chart containing information about other incidents involving tote and forklift accidents at its other facilities. The court granted a pre-trial motion in limine brought by Baker Hughes to exclude all of the incidents—save for a November 3, 2011 accident in which a tote slid forward off of a forklift when it was lifted to allow fluid to move into another container.

We review a district court's ruling regarding the admission of similar events for abuse of discretion. Four Corners Helicopters Inc. v. Turbomeca, 979 F.2d 1434, 1440 (10th Cir. 1992). In deciding whether a district court abused its discretion, we give the excluded evidence "its maximum reasonable probative value and minimum reasonable risk of unfair prejudice or jury confusion." Boardwalk Apartments L.C. v. State Auto Prop. & Cas. Ins. Co., 816 F.3d 1284, 1288 (10th Cir. 2016). The burden of proving substantial similarity between the incident at issue and the prior events falls on the party seeking to admit the evidence. Wheeler v. John Deere Co., 862 F.2d 1404, 1407 (10th Cir. 1988). "Evidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury. The requirement is relaxed, however, when the evidence of other accidents is submitted to prove notice or awareness of the potential defect." Id. at 1407-08.

Plaintiff contends that because Baker Hughes produced records of the incidents at issue in response to discovery requests, Baker Hughes essentially stipulated to its control over the various subsidiaries and to the prior events'

10

similarity to the circumstances surrounding Morgan's death. Rejecting this argument, the district court explained that plaintiff did not present evidence that Baker Hughes had control over the operations at issue in the prior incidents or that the prior incidents were substantially similar to the circumstances surrounding Morgan's death. We do not discern any error in the district court's analysis. Because plaintiff did not establish that Baker Hughes was responsible for the prior incidents, she did not "establish the substantial similarity" of the prior incidents "to the accident that caused the death of" Morgan. Black v. M & W Gear Co., 269 F.3d 1220, 1228 (10th Cir. 2001).

**B**

Plaintiff also sought to admit a statement made by counsel for Baker Hughes and/or Baker Petrolite[6] during the OSHA investigation of Morgan's death. Specifically, during negotiations with OSHA, counsel wrote a letter stating: "My client has undertaken an extensive search, but couldn't find any written procedures governing how to take fluid samples from a tote, and/or documentation of training on such procedures. In short, we can provide no documentation to show that Mr. Morgan was trained not to do what he did." Baker Hughes moved to exclude all evidence related to the OSHA negotiation and the district court granted that motion.

---

[6] The district court expressly declined to rule on whether the declarant represented Baker Hughes or Baker Petrolite. Because the statement was made during settlement negotiations, we hold that it was inadmissible for the purpose of impeachment under Fed. R. Evid. 408. We therefore "need not resolve this factual dispute," as it is not "determinative of this appeal." Resale Mobile Homes, Inc. v. Comm'r of Internal Revenue, 965 F.2d 818, 821 (10th Cir. 1992).

11

We affirm the district court's exclusion of this statement.  Although evidence of "a statement made during compromise negotiations about [a] claim" is not admissible on "behalf of any party . . . to impeach by prior inconsistent statement," such evidence may be admitted for other purposes.  Fed. R. Evid. 408(a)(2), 408(b).  Plaintiff argues that she should be permitted to introduce the statement because it "contradicts" Baker Hughes' position that Morgan was properly trained.  Because the statements plainly "were the result of settlement negotiations," we hold that the district court had "ample grounds for its ruling, and we do not consider it an abuse of discretion to exclude this evidence."  Richards v. City of Topeka, 173 F.3d 1247, 1253 (10th Cir. 1999).

## C

Finally, plaintiff challenges the district court's refusal to take judicial notice of Baker Hughes' Fed. R. Civ. P. 26 disclosures.  In those disclosures, Baker Hughes identified Richard James, David Munzenmaier, and Todd Shilt as individuals likely to possess discoverable information about the case.  The disclosures described James as "[f]irst with BJ Services Company and later with Baker Petrolite Corporation"; Munzenmaier as "HSE Director, Baker Hughes"; and Shilt as "HSE Specialist, Baker Hughes."  The district court declined to take judicial notice of the disclosures, stating that it did not view these kinds of facts as appropriate to admit into evidence under Fed. R. Evid. 201.

"We review a district court's decision not to take judicial notice for abuse of discretion."  O'Toole v. Northrop Grumman Corp., 499 F.3d 1218, 1224 (10th Cir.

12

2007).  A court must take judicial notice of certain facts if a party requests it do so and supplies the court with the necessary information.  Fed. R. Evid. 201(c)(2).  Facts subject to judicial notice are those "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Although not required to do so, a court "is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Binford v. United States, 436 F.3d 1252, 1256 n.7 (10th Cir. 2006) (quotation omitted).  However, such documents "may only be considered to show their contents, not to prove the truth of the matters asserted therein."  Tal v. Hogan, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (quotation omitted).

Based on the disclosures, plaintiff asked the court to admit as adjudicative facts that:  (1) the named employees worked for Baker Hughes, and (2) Baker Hughes had admitted that it employed the named individuals.  Because Rule 26 disclosures are exchanged between parties, Fed. R. Civ. P. Rule 26(a), we do not typically consider such disclosures "filed with the court."  See Nunez v. Allstate Ins. Co., 604 F.3d 840, 847 (5th Cir. 2010).  Even if the disclosures were to constitute filings, judicial notice of the disclosures' contents would be inappropriate.  Identity of the employer of key witnesses in a case that hinges on whether a parent corporation "assumed an independent duty vis-à-vis" an employee of a subsidiary is a critical issue.  Loredo, 212 P.3d at 626.  It is not the kind of neutral and indisputable fact that

13

Fed. R. Civ. P. 201 was intended to address. We conclude that the district court did not abuse its discretion in declining to take judicial notice of Baker Hughes' Rule 26 disclosures.

**IV**

We **REVERSE** the district court's grant of JMOL, **AFFIRM** its evidentiary rulings, and **REMAND** for further proceedings.

Entered for the Court


Carlos F. Lucero
Circuit Judge

Case No. 17-8002, *Morgan v. Baker Hughes Incorporated*
**O'BRIEN**, J., concurring in part, dissenting in part.

Morgan's[1] evidence failed to show how Baker Hughes Incorporated (Baker Hughes) retained or exercised control over forklift operation, safety, and training at Baker Petrolite's warehouse sufficient to hold it liable for Morgan's death under Wyoming law.[2] Because the trial judge properly pretermitted the control issue with a judgment as a matter of law (JMOL), I respectfully dissent from the Majority's contrary opinion. On the other hand, I join the Majority in affirming his evidentiary decisions.

Three entities are here involved: (1) Baker Hughes, (2) one of its many subsidiaries, Baker Petrolite, and (3) the entity Baker Petrolite succeeded, BJ Services Company, which was Morgan's former employer and the previous owner of the Casper warehouse. Even though Baker Petrolite was Morgan's employer at the time of his death, its liability is not at issue.[3] Nor is the liability of BJ Services Company at issue—it was not Morgan's employer at the time of his death and had no control over the conditions of

---

[1] Katherine Morgan was appointed as the wrongful death representative of David Morgan. *See* Wyo. Stat. Ann. §§ 1-38-101 to -105. She is the plaintiff in this case. Nevertheless, I will refer simply to David Morgan (Morgan).

[2] "I would invoke those who fill the seats of justice, and all who minister at her altar, that they execute the wholesome and necessary severity of the law." Daniel Webster's Plymouth Oration, Plymouth, Massachusetts (Dec. 22, 1820). A tragic death always strikes emotional chords. The trial judge set emotion aside and applied the law.

[3] Because Baker Petrolite was Morgan's employer at the time of his death, his estate was entitled to worker's compensation benefits. Those benefits were the estate's sole and exclusive remedy against Baker Petrolite, which was otherwise immune from suit for workplace injuries under the Wyoming Worker's Compensation Act. *See Knight ex rel. Knight v. Estate of McCoy*, 341 P.3d 412, 415-16 (Wyo. 2015).

his employment.[4]  The only issue we face is whether Baker Hughes was liable for Morgan's death.  The answer to that question turns on whether it owed Morgan a legal duty, independent of that owed to him by its subsidiary and his employer, Baker Petrolite.[5]  *Loredo v. Solvay Am., Inc.*, 212 P.3d 614, 622 (Wyo. 2009).  "Generally, the question of whether a duty exists is a question of law . . . ."  *See Williams v. Plains Tire & Battery Co.*, 405 P.3d 228, 232 (Wyo. 2017).  However, Baker Hughes' duty is defined by its control of Baker Petrolite, which is ordinarily "a question of fact . . . but becomes one of law when only one reasonable inference can be drawn."  *Loredo*, 212 P.3d at 622.

If Baker Hughes exercised or retained sufficient control over the particular aspect of Baker Petrolite's operation resulting in Morgan's death it might be liable, but only if that control constrained Baker Petrolite from conducting that aspect of its operation "in [its] own way."  *See* Restatement (Second) of Torts § 414 cmt. c; *see also Fiscus v. Atl. Richfield*, 773 P.2d 158, 160 (Wyo. 1989); *Loredo*, 212 P.3d at 624.  In other words, only discrete and pervasive levels of retained control are sufficient.  *See Franks v. Indep. Prod. Co.*, 96 P.3d 484, 490-91 (Wyo. 2004), discussed *infra* note 17.

---

[4] The judge dismissed BJ Services Company on this basis; Morgan has not appealed from that dismissal.

[5] The other elements of a negligence claim—breach of duty, causation, and damages—are not at issue in this appeal.  *See Loredo*, 212 P.3d at 622.  That is because without a duty, there can be no liability.  *See Johnson v. Dale C. & Helen W. Johnson Family Revocable Trust*, 345 P.3d 883, 887 (Wyo. 2015) ("[T]o establish a claim for negligence, a plaintiff must show the following: (1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the defendant's breach of the duty of care proximately caused the plaintiff's injury or injuries; and (4) the plaintiff has suffered an injury that is compensable by money damages.").

The retention of control language derives from § 414 of the Restatement (Second) of the Law of Torts. *See Jones v. Chevron, U.S.A., Inc.*, 718 P.2d 890, 895-96 (Wyo. 1986); *see also Merit Energy Co. v. Horr*, 366 P.3d 489, 494 (Wyo. 2016). It provides:

> One who entrusts work to an independent contractor, *but who retains the control of any part of the work*, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement (Second) of Torts § 414 (1965) (emphasis added).

This section refers to the liability of an employer of an independent contractor [IC] for injury to the IC's employee. I agree with the Majority: whether a parent corporation can be held liable for a subsidiary employee's injury is essentially the same test used to determine whether an IC's employer can be held liable for injury to an IC's employee.[6] *See Fiscus*, 773 P.2d at 160. But that does not end the analysis. The commentary to § 414 (and Wyoming case law) clarifies <u>what level of retained control</u> is necessary to subject a parent corporation to liability:

> In order for [§ 414] to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the

---

[6] However, there is an important difference. The employer of an IC can be held vicariously liable for the IC's negligence under the doctrine of respondent superior if the employer exercises a high level of control over the IC akin to that of a master-servant relationship. *See Merit Energy Co.*, 366 P.3d at 495-96. That said, Wyoming has "rejected any doctrine of respondeat superior resulting in liability on the part of a parent corporation for acts of its subsidiary. The parent company is entitled to the same legal separation from its subsidiary, as well as the resulting protection from liability, that any individual shareholder enjoys with respect to a corporation in which stock is held." *Fiscus*, 773 P.2d at 160 (citations omitted).

3

contractor is controlled as to his methods of work, or as to operative detail. *There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.*

Restatement (Second) of Torts § 414 cmt. c (emphasis added); *see also Merit Energy Co.*, 366 P.3d at 494 ("The comments to § 414 provide helpful guidance as to the level of control required . . . .").

The trial judge defined the operation involved in Morgan's death as "the operation of the forklift and the training and the safety program relating to it." (Jt. App'x Vol. 9 at 2162.) Neither party objects to that classification. However, the operation involved in Morgan's death was not the operation of a forklift in general, but rather the taking of a liquid sample from the underside of a tote cradled, but not secured, on the tines of an elevated forklift. That is, precisely, what Morgan was doing at the time of his death.

Morgan and his co-worker of 20-years, James Clore, had been taking samples from totes suspended on an elevated forklift since their employment with BJ Services Company began (well before 2010, when Baker Petrolite took over operations at the Casper warehouse). Baker Hughes provided no direction or guidance concerning the sampling process used in Baker Petrolite's Casper warehouse[7] and its February 2012 Forklift Safety Procedure manual (forklift safety manual) did not specifically address it.

---

[7] During a June 2012 visit to the warehouse, Richard Bui, the "top safety guy" at Baker Petrolite, noticed a rope tied to the forklift and asked Morgan about the strapping of totes to the forklift. (Jt. App'x Vol. 11 at 2658.) Morgan informed him that BJ Services Company had wanted him and Clore to use a nylon cargo strap rather than a nylon rope. When Morgan said he thought a rope was sufficient, Bui disagreed, preferring BJ Services Company's policy. Be that as it may, the "advice" offered by Baker Petrolite's "top safety guy" does not establish the requisite level of control by Baker Hughes.

4

As a matter of fact, in the late 1990's, Morgan and Clore (who had considerable latitude with respect to such practices) decided to secure the tote to the forklift with a rope or strap when moving or sampling from it. Morgan used <u>no</u> restraints on the day of the accident.

Because the judge granted JMOL to Baker Hughes at the close of Morgan's evidence under Fed. R. Civ. P. 50(a), our specific inquiry is: Whether Morgan presented sufficient evidence from which a jury could reasonably conclude that Baker Hughes exercised or retained sufficient control over Baker Petrolite's forklift operations to subject it to liability under Wyoming law. *See Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013) ("[JMOL] is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position.") (quotation marks omitted).[8] I agree with the Majority that in making

---

[8] The standard for reviewing judgments as a matter of law under Rule 50(a) "mirrors the summary judgment standard in that 'the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.'" *See Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1247 (10th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "The primary difference between [motions for summary judgment and motions for JMOL] is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while [JMOL motions] are made at trial and decided on the evidence that has been admitted." *Anderson*, 477 U.S. at 251 (quotation marks omitted).

In this case, the judge denied Baker Hughes' motion for summary judgment on the issue of control, because, on the record at the time, there appeared to be genuine issues of material fact concerning that issue. Yet, after hearing <u>ALL</u> of Morgan's evidence, including the cross-examination of witnesses, he entered a JMOL in favor of Baker Hughes (on the same issue) at the close of Morgan's case. Morgan claims no impropriety in that course of action. Nor could he. "[A] denial of summary judgment does not rule out the possibility of [JMOL]" even if the evidence at the summary judgment stage is substantially similar to that presented at trial. *See Sandoval v. U.S. Smelting, Ref. &*

5

this determination, we must review the evidence in the light most favorable to Morgan. *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1126 (10th Cir. 2012). But that does not mean we consider only the evidence most favorable to him. Rather, we refrain from cherry-picking and instead consider <u>all of the evidence presented at that point in the trial</u>.[9] *See Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1047 (10th Cir. 2016) (a party is "entitled to [JMOL] *only if all of the evidence [in the trial record]*, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party.") (emphasis added) (quotation marks omitted).

The evidence relating to control, taken in the light most favorable to Morgan, was limited to the following:

- Baker Hughes issued a "[m]andatory" forklift safety manual on February 1, 2012. (Trial Exs. Vol. 8 at 1224.) Ostensibly, the manual applied to its subsidiaries and was available to its subsidiaries online.

---

*Mining Co.*, 544 F.2d 463, 464 (10th Cir. 1976); *see also Gross v. S. Ry. Co.*, 446 F.2d 1057, 1060 (5th Cir. 1971).

[9] In footnotes 2 and 3, the Majority opinion seems to accuse me of weighing the evidence. That is simply not so. I merely point out the undisputed evidence it ignores: the Casper warehouse, operated by Baker Petrolite, was following BJ Services Company's forklift safety procedures at the time of Morgan's death and the Baker Hughes safety manual was not then and there in place or, apparently, even consulted. Morgan's own safety expert admitted this. Preferring dubious "lack of clarity" evidence to undisputed testimony, the Majority does not, as it claims, studiously avoid fact finding; conjuring the specter of speculation creates the illusion of a factual question on the issue of control when there is none. This is not unlike a Fourth Amendment case, where the Supreme Court rejected any "divide-and-conquer" approach when reviewing the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (whether reasonable suspicion exists to support a traffic stop must be based on the totality of the circumstances; rejecting appellate court's evaluation of disparate facts in isolation from each other in deciding whether reasonable suspicion existed).

6

- In June 2012, Richard Bui and Todd Shilt visited the Casper warehouse. At that time and at the time of Morgan's death, Bui was the "top safety guy" at Baker Petrolite (Jt. App'x Vol. 11 at 2658); he reported to both the President of Baker Petrolite and the Vice President of Health, Safety, Environment, and Security (HSE) at Baker Hughes. Shilt was a safety representative employed by Baker Petrolite who was responsible for providing support to the Casper warehouse regarding safety issues and performing safety audits at the warehouse.

  During their June visit, Bui and Shilt toured the warehouse. Bui noticed a rope tied to the forklift and asked Morgan about the strapping of totes to the forklift. Morgan informed him that BJ Services Company had wanted him and Clore to use a nylon cargo strap rather than a nylon rope. When Morgan said he thought a rope was sufficient, Bui disagreed, saying a strap was "probably better." (Jt. App'x Vol. 11 at 2688.)

- Baker Hughes issued a safety alert following Morgan's death. It described the circumstances surrounding his death and made "immediate recommendations for forklift operations" including ensuring all employees operating forklifts are properly trained and all loads are secure and fully engaged by the forklift's forks. (Trial Exs. Vol. 15 at 1343.) It also described "actions to prevent reoccurrence" including using a tote stand if available when working on or near an elevated tote.[10] (*Id*.)

Neither the Majority nor Morgan relies on Bui and Shilt's visit to the warehouse or

Bui's preference for a nylon strap over a rope for securing a tote to the forklift. Rightly

so. Even assuming Baker Petrolite's safety guys, Bui and Shilt, were acting on behalf of

---

[10] The judge concluded the safety alert was inadmissible to show Baker Hughes acted negligently because it contained "subsequent remedial measures." *See* Fed. R. Evid. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . negligence."). He did, however, admit the safety alert for the limited purpose of considering Baker Hughes' alleged control over forklift safety at the warehouse. *Id*. (allowing court to admit evidence of subsequent remedial measures on the issues of ownership or control, if disputed); *see also Hull v. Chevron USA Inc.*, 812 F.2d 584, 586-87 (10th Cir. 1987) (recognizing that subsequent remedial measures may be admissible where issues of ownership or control are disputed).

7

Baker Hughes,[11] visiting work sites and making safety recommendations are clearly insufficient under Wyoming law to demonstrate the control necessary to establish parent corporation liability. *See, e.g., Loredo*, 212 P.3d at 625 ("To impose liability upon Solvay America [the parent corporation], it is not enough that Solvay America exercised a general right to inspect the mine or to receive reports, to make suggestions or recommendations which were not necessary to follow, or to prescribe alterations and deviations to the work.") (quotation marks omitted); *Wayts v. Peter Kiewit Sons, Inc.*, No. 90-8022, 1991 WL 114736, at *2 (10th Cir. June 27, 1991) (unpublished) (refusing to hold parent corporations liable for injuries sustained by a subsidiary's employee even though parent corporations "advised [subsidiary] regarding safety matters, injury prevention, and company-wide safety policies" and "visited [the subsidiary] to monitor compliance with general company-wide safety policies and federal regulations"). This is especially true here, where Bui's recommendation (use a cargo strap rather than a rope to secure the tote to the forklift) had nothing to do with Morgan's death. Morgan failed to strap the tote to the forklift by any means.[12]

---

[11] Bui testified the expenses for the June 2012 trip were paid for by Baker Petrolite. Morgan, however, claimed they were paid for by Baker Hughes because the expense reports refer to "Policy: [Baker Hughes Incorporated] Expense Policy." (Trial Exs. Vol. 4 at 1056, 1069.) Pretty thin.

[12] Mentioning Morgan's failure to secure the tote to the forklift is not intended to prematurely suggest liability on his part (i.e., comparative negligence), although he did admit at trial that he "had some fault." (Jt. App'x Vol. 11 at 2622.) I mention it only to demonstrate that Bui's recommendation did not relate to the "aspect of [Baker Petrolite's] operation . . . involved in the incident resulting in [Morgan's death]." *Fiscus*, 773 P.2d at 160. And, in any event, it was ignored.

The Majority rests its analysis primarily on the February 2012 forklift safety manual, but it adds a few makeweights: (1) Bui's dual-reporting obligations; (2) the testimony of various employees who did not know precisely which Baker Hughes subsidiary employed their co-workers at any given time, and (3) some individuals paid by Baker Petrolite described themselves as "with Baker Hughes" and used Baker Hughes email addresses. As I later explain, these items, even considered collectively, add little weight to the question of fact as to whether Baker Hughes controlled forklift safety at the Casper warehouse.

I now return to the forklift safety manual, upon which Morgan also relies. Again, I agree with the Majority's statement of the law: the mere promulgation of company safety policies is not enough to establish the requisite control. *See Fiscus*, 773 P.2d at 162-63; *see also Loredo*, 212 P.3d at 624-25. I part company when it goes on to conclude the safety manual issued by Baker Hughes is different because it "provided such detail that a reasonable jury could consider Baker Hughes' control over Baker Petrolite to be far more significant than the 'general, generic' and optional guidelines at issue in *Loredo*." *Id*. at 7-8 (quoting *Loredo*, 212 P.3d at 625.) It reasons:

> The manual established a number of mandatory requirements, such as how many feet the operator must be from the machine before he can switch it off and how many inches a load may be raised during transport. It is difficult to imagine that a facility could develop its own individual safety policy within the mandatory constraints set forth in the Baker Hughes manual. Plaintiff presented evidence that these policies were created by Baker Hughes, were not imposed by regulation, and that the manual applied to the Casper warehouse at the time of Morgan's death.

(*Id*. at 8.)

9

I fail to see the logic, because it ignores hard evidence to the contrary, namely the testimony of Clore, a Baker Petrolite employee and Morgan's co-worker of 20 years. He unequivocally testified that at the time of Morgan's death, the Casper warehouse followed the forklift safety procedures of BJ Services Company; no one from Baker Hughes directed Morgan and Clore (both Baker Petrolite employees) on proper forklift operations. Baker Hughes' forklift safety manual may have theoretically <u>applied to</u> the Casper warehouse, but, in fact, Baker Petrolite, the operator of the facility, was <u>not</u> <u>actually following the manual at the time of Morgan's death</u>. Baker Petrolite was, as the facts here clearly demonstrated, left free "to do the work in [its] own way." Restatement (Second) of Torts § 414.

In that regard, the Majority acknowledges that although the Baker Hughes manual was available electronically to its subsidiaries, it was never provided directly to Morgan or to Baker Petrolite's Casper warehouse. It also recognizes that each subsidiary was "ultimately responsible for applying the guidelines in the manual," including ensuring its requirements were implemented and verifying its employees were appropriately trained.[13] (Majority Op. at 3.)

Baker Hughes says the actual state of affairs at the warehouse is proof positive that the forklift safety manual was a guideline, which Baker Petrolite was free to, and did, ignore. On the other hand, Morgan's safety expert testified that the manual was not in

---

[13] That <u>Baker Petrolite</u> had not yet implemented the procedures in the manual at the Casper warehouse as required speaks to <u>its</u> liability, not that of Baker Hughes. But Baker Petrolite's liability is not at issue. *See supra* note 3.

10

effect at the Casper warehouse, but should have been. Morgan's argument comes in two parts: Baker Hughes' forklift safety manual controlled Baker Petrolite's safety program and Baker Hughes was negligent for failing to aggressively implement the manual by the time of Morgan's death, even though it was promulgated seven months before. In other words, Baker Hughes is damned if it does and damned if it doesn't. That is quite an anomaly. I agree with the trial judge: Morgan's argument effectively speaks volumes about Baker Hughes' actual exercise or retention of control over forklift safety at the Casper warehouse. One might say, "actions speak louder than words."[14] Morgan demurs.

According to him, the forklift safety manual, although not implemented at the Casper warehouse at the time of Morgan's death, demonstrates that Baker Hughes retained the right to control forklift safety. But it is necessary to return to first principles: merely retaining a bare right to control is not enough. The retention must be such "that [the subsidiary] is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c; *see also Merit Energy Co*., 366 P.3d at 494-95. The evidence is clear: Baker Petrolite operated the Casper warehouse, including forklift safety, as it saw fit. And I am aware of no legal authority imposing on Baker Hughes an independent duty to expansively oversee Baker Petrolite's safety program. As I have repeatedly said, the issue is whether, in fact, not in theory, Baker Hughes required Baker Petrolite to toe the line.

---

[14] My mother frequently said so and was more than willing to demonstrate if I got too mouthy.

11

The Majority assigns much weight to the organizational structure of Baker Hughes. Too much weight, in my view. Bui testified to having reported to Baker Petrolite's President regarding the "day-to-day operations of Baker Petrolite" and receiving "strategic directions" from the head of HSE at Baker Hughes to take to Baker Petrolite. (Jt. App'x Vol. 11 at 2674-75.) These "strategic directions" were "administrative" and "visionary . . . road maps." (*Id*. at 2675.) There is no evidence of anything more. Specifically, and critically, there is no evidence or even a credible suggestion that these "strategic directions" concerned forklift safety at the Casper warehouse or forklift safety in general or that they were actually imposed upon Baker Petrolite. Without evidence that any guidance Bui may have received from Baker Hughes regarding forklift safety was to be imposed, chapter and verse, on Baker Petrolite, his dual-reporting obligations do not create a reasonable inference that Baker Hughes exercised or retained control over that aspect of Baker Petrolite's operation.

The Majority seemingly recognizes this in stating Bui's dual-reporting obligations alone do not suffice to impose liability on Baker Hughes. But it then claims those obligations somehow become sufficient when combined with the lack of clarity regarding who worked for Baker Hughes as opposed to Baker Petrolite. I simply fail to see how a "lack of clarity" can carry the day in deciding whether the <u>evidence</u> creates a question of fact for the jury on the "exercised or retained" control issue. Employees may not have known which subsidiary employed their coworkers, may have identified themselves as being "with Baker Hughes," and used Baker Hughes email addresses, but that is next to

12

meaningless.[15]  The Majority fails to explain <u>what actions</u> these employees took in establishing the requisite level of control.  There are none.

It does not indicate to which employees it is referring but I assume it is Clore, Shilt, and James Britton, as they are the only employees, besides Bui, who testified.  Clore believed he was informally charged with safety at the Casper warehouse by BJ Services Company and Baker Petrolite.  However, according to his testimony, while he was employed by Baker Petrolite (2010 to 2012, which included the date of Morgan's death), the Casper warehouse was still using BJ Services Company's forklift guidelines.  Moreover, he received no direction or instruction from Baker Hughes on how to operate a forklift or conduct forklift training.  So far, I see nothing suggesting Baker Hughes in any way deprived Baker Petrolite of the freedom to do things its own way.

Moving on, Shilt testified to being a resource for Morgan and Clore regarding safety issues that might arise at the Casper warehouse and performing safety audits at the

---

[15] Baker Petrolite employees may have stated they were "with Baker Hughes" or used email addresses containing "bakerhughes.com."  That is neither surprising nor enlightening.  Since Baker Hughes owns 100 legal entities in 80 countries, employees might well generically refer to "Baker Hughes" as their employer rather than a specific subsidiary (which might not have a well-known connection to Baker Hughes).  Baker Hughes is now substantially owned by General Electric Company (GE).  *See* https://www.bhge.com/newsroom/bhge-day1.  Some of its employees may now claim to work for GE.  That does not make it so!  The same is true for the email addresses; it seems practical to use "@bakerhughes.com" rather than 100 different email addresses.  Law firms do the same thing.  They often use email addresses containing only part of the firm's name (usually the first two partners listed) rather than the full legal name of the firm.  For instance, attorneys and support staff at the law firm of Gibson, Dunn & Crutcher, LLP, use email addresses containing simply "@gibsondunn.com."  And the Wyoming state courts use "name@courts.state.wy.us" irrespective of whether the employee works for the Wyoming Supreme Court, a state district court, a limited jurisdiction court, or some other affiliated body.

warehouse. But he also testified to being a Baker Petrolite employee at the time of Morgan's death. That is critically significant. Not only is there no evidence that Shilt actually exercised or retained control over forklift safety at the warehouse (simply advising on safety issues is not enough) but, even if he did, he did so as a Baker Petrolite employee, not a Baker Hughes employee. Finally, Britton testified to working for Baker Petrolite, but was unclear which entity (Baker Hughes or Baker Petrolite) issued his paycheck. About one thing, however, he was certain—although he had some control over the Casper warehouse when he worked for Unichem and BJ Services Company (previous owners), he had no role with respect to safety at the warehouse while employed in the Baker Hughes family.

According to Morgan, a safety alert issued after Morgan's death demonstrates Baker Hughes' right to control forklift safety at the warehouse.[16] Baker Hughes says the alert was issued by Baker Petrolite; Morgan, on the other hand, insists the alert was issued by Baker Hughes because it contains the Baker Hughes copyright and makes no mention of Baker Petrolite. At the very least, he claims, it is a question of fact for the jury. We need not weigh in on that debate, nor can we. *See Bannister*, 692 F.3d at 1126 (in reviewing a decision on a motion for JMOL, we view the evidence in the light most favorable to the nonmoving party and "refrain from weighing the evidence") (quotation marks omitted). Assuming the safety alert was issued by Baker Hughes doesn't carry the day. Wyoming law allows a parent corporation to advise its subsidiaries on safety matters, to require deficiencies to be corrected, and to investigate accidents without

---

[16] The Majority does not rely on the safety alert.

exposing itself to liability.  *See Wayts*, 1991 WL 114736, at *2; *see also Loredo*, 212

P.3d at 625 ("Case law precludes the inference of control by [a parent corporation] where

it operated in merely an 'advisory role' [to its subsidiary].").

A review of Wyoming case law is not merely instructive, it is the law of this case.

*See Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009) (in

diversity cases, federal law controls the procedural question of whether JMOL was

appropriate and the substantive law of the forum state controls the analysis of the

underlying claims).  Particularly enlightening are those cases in which the Wyoming

Supreme Court concluded a parent corporation exercised or retained sufficient control

over the aspect of the subsidiary's injury-producing operation to make the parent liable.[17]

---

[17] In more cases than not, however, the Wyoming Supreme Court has not found the requisite level of control.  *See*, *e.g.*, *Loredo*, 212 P.3d at 622 (parent corporation not liable for subsidiary employee's injuries at trona mine even though it regularly visited the mine, performed safety audits at the mine every three years to ensure compliance with established safety policies, and made recommendations to correct safety deficiencies, which the subsidiary was required to implement or provide a good reason for not doing so); *Hittel v. WOTCO, Inc.*, 996 P.2d 673, 677-78 (Wyo. 2000) (insufficient control where employer of IC hired to replace roofs on employer's buildings warned IC of skylights during pre-construction meeting and did not object to IC's plan concerning use of fall protection during roofing project); *Fiscus*, 773 P.2d at 160, 162-63 (insufficient control even though, *inter alia*, parent corporation owned the equipment which the subsidiary employee was operating when injured, visited the site several times a day, attended its subsidiary's safety meetings, interviewed all safety directors before they were hired by its subsidiary, and had two representatives on site who worked on the subsidiary's training program and set policy concerning that training); *Hill v. Pac. Power & Light Co.*, 765 P.2d 1348, 1350 (Wyo. 1988) (insufficient control where employer of IC made recommendations to the IC's foreman, inspected the work, and provided tools for project); *Stockwell v. Parker Drilling Co.*, 733 P.2d 1029, 1033 (Wyo. 1987) (insufficient control where owner of building site retained right to inspect construction progress and prescribe location of doors and windows on construction project); *see also Franks*, 96 P.3d at 490-91, where the court decided an employer owed no duty to the IC's employee who was killed unloading a well casing with a backhoe even though the

15

Take note: Baker Hughes' control (if any) pales in comparison to that exercised in those cases, which I now discuss.

In *Jones v. Chevron U.S.A.*, the Wyoming Supreme Court decided Chevron, the owner of the worksite, could be held liable for the electrocution of an IC's employee where the evidence showed (1) only Chevron could authorize de-energizing the power lines where the IC employee was working and (2) Chevron had made that limitation clear to the IC because the lines were needed to power its oil and gas wells and Chevron did not want the lines de-energized unless absolutely necessary. 718 P.2d 890, 896-97 (Wyo. 1986). That was so, the Court said, even though the IC had never requested de-energization. *Id*. at 897. But there was more to it than that; the Court reasoned:

> If Chevron had not discouraged de-energization . . . , if it had made permission easier to obtain, and if it had permitted de-energization whenever requested by [the IC]—vesting the decision to de-energize and thus control in [the IC]—then [the IC] might have de-energized and the injury might have been avoided. Chevron retained enough real control to raise a duty of reasonable care.

*Id*. Nothing here comes close. A published forklift safety policy that was left to Baker Petrolite to interpret and apply "in [its] own way," *see* Restatement (Second) of Torts § 414, is not comparable to the pervasive control reserved and exercised by Chevron.

So, too, it is in *Merit Energy Co. v. Horr*, 366 P.3d 489 (Wyo. 2016). Merit Energy hired Basic Energy to clean out its high pressure oil and gas wells. *Id*. at 492. Merit provided Basic with a blowout preventer containing a "Washington" stripper head

---

employer ordered the use of the backhoe, conducted frequent safety meetings at the well site, and frequently shut down the well site for safety reasons. That result came after the court observed that an employer of an IC may be held liable for injury to an IC's employee if the employer (1) "exercises controlling and pervasive role over the [IC]'s work" or (2) "assumes affirmative safety duties."

16

to clean out the wells. *Id.* at 493. The Washington head contained a release valve capable of relieving pressure trapped between it and the blowout preventer. *Id.* Without the release valve, the well would have to be "killed" to control the pressure. *Id.*

Merit eventually told Basic that it would no longer pay for the Washington head and Basic needed to provide a different one. *Id.* Basic obtained a stripper head without a release valve; Merit approved it. *Id.* One day, while Horr, a Basic employee, was working on one of the wells, the drill pipe became stuck in the rubber seal in the wellhead. *Id.* He stopped work and asked the appropriate Merit employee for direction on how to proceed. *Id.* Knowing the stripper head had no release valve and without checking the well pressure or inspecting the problem, Merit told Horr to replace the stripping rubber. *Id.* When Horr did as instructed, the pressure trapped between the blowout preventer and the stripper head (the one without a release valve) blew the stripper head out of the well head, striking and injuring Horr. *Id.* at 493-94.

The Wyoming Supreme Court concluded the evidence relating to Merit's exercise or retention of control was sufficient to prevent a JMOL in Merit's favor. *Id.* at 499. Merit controlled the pressure of its wells through injection of $CO_2$, specially approved the equipment used to control the pressure, including the stripper head (without a release valve), and told Horr what to do (what affirmative action to take) <u>at the time</u> when the drill pipe became stuck during the cleanout process and it did so without first personally checking the well pressure or inspecting the problem. *Id.* As in *Jones*, Merit's actions were hardly benign; it actively controlled critical aspects of the injury-producing conduct.

17

One matter is particularly worthy of note. In both *Jones* and *Merit*, the parent

corporation actually controlled the injury-producing conduct; in *Jones*, it was the de-

energization of the power lines and, in *Horr*, it was the pressurization of the wells, the

approval of a stripper head without a release valve, and specific instruction to the

employee without first personally inspecting the well.[18]

Comparative analysis is a wholesome tool. Speculation is less compelling.

Morgan claims that "it is instructive to consider how [Baker Hughes] *could have* retained

or exercised a 'right to control' over forklift safety if it had wanted to do so." (Morgan's

Opening Br. at 30.) As the argument goes, because Baker Hughes has no employees,[19]

"there would be no routine [Baker Hughes] personnel 'on the ground'" and "it is highly

---

[18] Morgan relies heavily on *Smith v. Atlantic Richfield Co.*, where we affirmed the district court's denial of a parent corporation's motion for summary judgment because the evidence showed the parent corporation was providing safety advice and services to the subsidiary and it was a question of fact as to whether the subsidiary had delegated these responsibilities to the parent corporation. 814 F.2d 1481, 1488-89 (10th Cir. 1987). The difficulty with that case is that we decided that issue in the same decision in which we affirmed the jury's general verdict in favor of the parent corporation. In other words, the parent corporation was challenging the denial of summary judgment even though it had won at trial. Therefore, it is difficult to know exactly which facts were pertinent to our decision affirming the denial of summary judgment because we outlined the facts as they were presented at trial. It is also unclear whether the jury found in favor of the parent corporation due to lack of control or rather because it was not negligent—both were issues before the jury. *Id.* at 1482-83. As a result, the case has quite limited utility.

[19] Bui said Baker Hughes has no employees. Yet, he acknowledged that Baker Hughes has a CEO and a senior vice president of health, safety, and environment. He also testified to having been recently promoted to vice president of health and safety at Baker Hughes. Baker Hughes also has a Board of Directors. *See* https://www.bakerhughes.com/company/corporate-social-responsibility/compliance-and-ethics/corporate-governance; *see also* https://www.bhge.com/our-company. It appears Bui's "Baker Hughes has no employees" statement simply refers to the fact that Baker Hughes did not issue paychecks to any of these individuals. For unexplained reasons, their paychecks were issued by Baker Hughes subsidiaries.

unlikely that [Baker Hughes' top executives] would be present to exercise direct control of forklift safety in a warehouse in Casper, Wyoming." (*Id*.) "The only way that [Baker Hughes] *could have* retained or exercised control of forklift safety in Baker Hughes facilities was by promulgating extensive guidelines and procedures, binding on all its subsidiaries. That is, of course, exactly what [Baker Hughes] did." (*Id*. at 31.) The argument is ultimately self-defeating.

Suggesting the mere promulgation of guidelines is sufficient in this case because it is "[t]he only way" Baker Hughes could have retained or exercised control of forklift safety at the warehouse is nonsense. Parent companies have myriad means of bringing subsidiaries to heel if they choose to do so. Morgan's argument effectively admits that the promulgation of the forklift safety manual is the only control Baker Hughes actually retained or exercised and that is not enough under Wyoming law.[20] The manual required the facility manager to ensure its requirements were implemented and required employees and contract employees to comply with those requirements. Baker Hughes may have hoped or even assumed Baker Petrolite would apply the manual in its operations at the warehouse, but the operative fact remains unchallenged–for whatever reason, Baker Petrolite did not to do so at any time, up to and including the date of Morgan's death.[21] Any fault in not implementing the manual rests with Baker Petrolite.

---

[20] If Morgan is suggesting that Baker Hughes has some general, overarching duty to superintend Baker Petrolite's operations, he provides no supporting legal authority.

[21] Morgan argues it is improper for a parent corporation like Baker Hughes to immunize itself from liability for actions taken on the highest level of the corporation by claiming those actions were technically taken by employees of subsidiaries. I am aware of nothing in the record showing Baker Petrolite to be a shell corporation without

19

I recognize the issue of control is ordinarily a question of fact for the jury. *Loredo*, 212 P.3d at 622. However, it "becomes one of law *when only one reasonable inference can be drawn*." *Id*. (emphasis added) (quotation marks omitted). Rule 50 is one of the tools necessary to insure that the law (reason, not emotion) controls. It "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1089 (10th Cir. 2001) (quotation marks omitted). So it is here. The JMOL was proper.

---

resources. But, it does enjoy immunity from suit because it pays into the worker's compensation fund, which, for the most part, is not voluntary. The Wyoming Constitution provided a quid pro quo. Companies are strictly liable for workplace injuries and, in return, they are shielded from further liability. *See* Wyo. Const. art. 10, § 4(c); *see also* Wyo. Stat. Ann. §§ 27-14-101 to -806. Worker's compensation benefits may seem inadequate in some instances, prompting a search for deep pockets, an endeavor obviously at the heart of this case. On the other hand, affiliated companies do not want to pay twice—once into the worker's compensation fund and again in a lawsuit. That metric has resulted in a constant, intricate dance not likely to end soon and involving policy choices beyond our ken. Applying Wyoming law is our only calling. "[Ours] not to make reply, [Ours] not to reason why, [Ours] but to do and die: Into the valley of Death Rode the six hundred." Alfred Lord Tennyson, The Charge of the Light Brigade (1854).